## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| REGENT COMMUNICATIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **Civil Action No. 07-499** |
| | ) |
| RILEY INVESTMENT PARTNERS | ) |
| MASTER FUND, L.P., RILEY | ) |
| INVESTMENT MANAGEMENT, LLC. and | ) |
| SMH CAPITAL INC., | ) |
| | ) |
| Defendants. | ) |

### PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff Regent Communications, Inc. ("Regent" or the "Company") hereby seeks a temporary restraining order to preserve the status quo pending an adjudication of its request for preliminary injunction to enjoin the call of a special meeting of Regent's stockholders and/or the continuing solicitation or voting of any proxies in support of the proposals sought to be acted upon at that meeting since such solicitations are in violation of the federal securities laws. In support of its motion, Regent states as follows.

### INTRODUCTION

This action involves ongoing violations of Sections 13 and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by two investment firms: Riley, a noted corporate raider which in the past few months acquired a 7.4% stake in Regent, and SMH Capital, Inc. ("SMH"), which controls a significant but undisclosed stake in Regent as well.

Riley which has engaged in more than 20 recent corporate contests, is seeking to wrest control of Regent's Board, stealthily buying Regent's stock at depressed prices and forming an undisclosed control group with other shareholders, in order ultimately to force and profit from Regent's sale to the detriment of Regent's other shareholders. In support of its attempt to force a

meeting to force their way onto the Board so as to force Regent's sale, Riley solicited more than

ten Regent shareholders, including defendant SMH, to demand a special meeting.  While Riley

provided the shareholders it solicited with convenient fill-in-the-blanks forms for making the

demand it desired (the "Form Demand Letters") and thereby solicited consents or authorizations

governed by federal proxy rules, Riley failed to provide those shareholders with any of the

information the federal securities laws including the proxy rules require.

Moreover, Riley and SMH concealed the facts concerning the purposes of and

arrangements between and among themselves and other shareholders in their secret "group",

including Riley's four nominees for election as directors to fill the new positions on the board

Riley hopes through its proposals to create.  These undisclosed understandings and agreements

are not limited to agreements to call the meeting and support the proposals and nominees put

forward by Riley, but also included agreements for SMH to act as a participant, both as a seller

and potentially as an investment banker, in any change of control transaction which Riley and

SMH seek to engineer.

## I.     FACTUAL BACKGROUND AND PROCEDURAL POSTURE.

### A.     Riley's Solicitation Of Shareholders To Join in Riley's Demand To Expand Regent's Board And Nominate Riley's Slate of Directors.

Regent is a Delaware corporation with its principal place of business in Covington,

Kentucky, that owns and operates radio stations.  As Riley has acknowledged in its public

filings, in the past few years, Regent has turned in strong operational performance both due to

the success of its continuing operations and recent strategic acquisitions and posted consistent

organic growth rates which have outpaced the terrestrial radio industry's average.  However, as

Riley's filings also note, due to "negative public sentiment to the terrestrial radio broadcasting

market in general," "Regent's public market value has continued to decline."

2

For its own part, Riley is a self-professed "activist fund" involved in more than 20 recent hostile campaigns which have succeeded in placing its affiliates on the Boards of several public companies through proxy battles and other tactics. In the case of Regent, its latest target, Riley quickly and stealthily acquired a significant 7.4% stake in the Company. In a Schedule 13D filed on April 4, 2007, Riley stated that its purposes in acquiring and holding Regent's securities might include "seeking representation on the Board of Directors" or to "acquire the issuer," and stated in accompanying letter that "we believe that selling Regent Communications may offer the best alternative" and that "we believe that the Company should not remain an independent public company."

Beginning on July 19, 2007, Riley caused letters to be sent, purportedly on behalf of Riley and unnamed investment advisory clients of Riley and other Regent shareholders (the "Riley Form Demand Letters"), calling for a special meeting of the Company's stockholders to: (1) amend the Company's bylaws to fix the number of directors at nine, (2) amend the Company's bylaws to allow stockholders to fill vacancies on the board created by increasing the size of the board or the removal of a director by the stockholders, (3) elect John Ahn, Bob D'Agostino, Jared Davis and Joseph Patrick Hannan as directors of the Company to fill the vacancies on the board; and (4) repeal any provisions or amendments to the Company's bylaws adopted after the last version filed with Securities and Exchange Commission.

Riley also solicited more than 10 other Regent shareholders to make similar demands. In correspondence to Regent, later filed with the SEC, Riley has admitted that it made at least "a handful of phone calls" to Regent investors in its successful efforts "to garner more than 20% of the shareholders [required] to call a special meeting" under Regent's bylaws and Delaware law. Thereafter 10 virtually identical Form Demand Letters were sent on behalf of at least 35 different beneficial owners, each copied to principal John Ahn at Riley.

3

The shareholders who were solicited by Riley to send the Form Demand Letters were solicited in violation of the federal proxy rules. These shareholders were not provided with proxy materials required by the federal securities laws before such solicitations can be properly made.

**B.    SMH Submits a Form Demand Letter To Regent But Fails To Disclose Its Interest in Regent As Required.**

The SMH Form Demand Letter, identical to that sent by Riley, even listed "RIP" as the short form definition for the shareholders on whose behalf demand was made. On August 3, 2007, Riley forwarded a Form Demand Letter dated July 31, 2007, on behalf of Pershing LLC with respect to 3,744,882 shares held by various customers listed in an attachment under the heading "SMH Capital" (the "SMH Form Demand Letter"). The SMH Form Demand Letter was not sent directly to Regent until August 8.

The list of shareholders attached to the SMH Form Demand Letter indicates that 2,197,881 shares – or more than 6 percent of Regent's shares – appear to be owned by Sanders-related shareholders. The aggregate number of shares listed on the SMH Form Demand Letter represent close to 10 percent of Regent's shares. Moreover, SMH has represented to potential purchasers it is soliciting to buy SMH's and others' shares that SMH controls 15.5% or as many as 6 million shares of Regent. In this unauthorized effort to sell a majority stake in Regent, SMH has circulated false and misleading materials representing that "certain shareholders" including Riley and "selected clients of Don Sanders" who are claimed to hold 7% and 15.5% of the Company's outstanding stock, respectively, would be willing to sell their shares. Although 5% shareholders and shareholders acting together as a group holding more than 5% are required to file a Schedule 13D, neither SMH nor any of the shareholders on the SMH Form Demand Letter list has filed a Schedule 13D and neither SMH nor Riley has filed a Schedule 13D on behalf of their group.

4

On August 9, 2007, Riley issued a press release announcing that it had filed suit in the Delaware Court of Chancery seeking to compel a special meeting of shareholders and acknowledging that it "may" seek to solicit proxies in support of its proposals to expand Regent's board, to elect almost half of its directors and then fill any vacancies so as to obtain a majority of the Board (the "Press Release"). The Press Release also acknowledges that Riley had been soliciting consents from Regent stockholders all along, acknowledging that it has made "telephone calls" which enabled it "to garner more than 20% of the shareholders to call a special meeting." On August 10, 2007, Riley filed the Press Release as soliciting materials under Rule 14a-12 under the Exchange Act. However, Rule 14a-12 plainly says that a definitive proxy statement meeting the requirements of the Exchange Act must be sent to shareholders before forms of proxy, consent or authorization are requested. Riley flagrantly ignored this requirement. In any event, the Press Release does not even mention and in no way cures but rather proves that its prior solicitations were made in violation of the securities laws without provision of the solicitation materials required by the proxy rules.

Moreover, the Press Release is misleading in characterizing Riley's true intention as merely conditional. Also materially false and misleading are Riley's prior filings on Schedule 13D, for failure to disclose Riley's arrangements, agreements and understandings with SMH and other shareholders and its intent ultimately to obtain control of Regent's board, to force the Company's sale and to profit on such sale from the stock they snapped – in SMH's case, without any disclosure – up at depressed prices at the expense of other shareholders.

## C. Riley and SMH Are Operating As An Undisclosed "Group" To Obtain Control of Regent.

The actions of Riley and certain other shareholders, including SMH, demonstrate that they have formed a group within the meaning of Rule 13(d) of the Exchange Act. Aggregating the 6% share interest owned by SMH and Sanders-related shareholders with the 7.4% owned by

5

Riley and its affiliates and investment advisory customers, the Riley/SMH Group holds at least 13.4% of the Company's shares. If SMH's representations to potential buyers are correct, SMH's holders alone exceed 15%.

Riley and SMH and their group have every motive to conceal their concerted activities and intentions because, if any stockholder or group of stockholders holds more than 15% of Regent's shares, various anti-takeover provisions may be immediately triggered, *i.e.*, Regent's shareholder rights plan and Section 203 of the Delaware General Corporation Law. These protections were intended by the Delaware legislature and by Regent's Board of Directors to prevent the very sort of stealth acquisition of control without payment of a control premium that defendants are attempting here.

## II.    ARGUMENT.

A temporary restraining order is an emergency remedy issued "to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." *Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D. Del. 1987). In granting a temporary restraining order, the court "must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing." *Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).

In this Circuit, "[g]enerally speaking, courts apply the standards for granting a preliminary injunction in determining the propriety of issuing a temporary restraining order." *Tootsie Roll*, 666 F. Supp. at 658. In determining whether the entry of a temporary restraining order is warranted, the court must consider whether: "(1) the movant has shown that there is a reasonable likelihood that it will succeed on the merits; (2) the movant has demonstrated that it will suffer irreparable harm absent the relief sought; (3) other parties will be substantially injured

6

by the relief; and (4) where the public interest lies." *Id.* No one factor will determine whether the court will enter a temporary restraining order and rather, all of these elements must be balanced. *Constructors Ass'n*, 573 F.2d at 815. Under this sliding scale, the greater the moving party's likelihood of prevailing on the merits, the less strongly it must show that the balance of harms weighs in its favor. *See id.*

As set forth below, Regent has established that it is entitled to a temporary restraining order, restraining Defendants from (1) soliciting consents to call or calling a Special Meeting and (2) from soliciting or voting proxies for the election of their directors and in support of their bylaw amendment proposals before they have provided proxy solicitation materials fully-compliant with the federal proxy rules. Moreover, this Court should order Riley, SMH, and others in their group to provide full and accurate information as required by Section 13 of the Exchange Act, disclosing the particulars concerning their shareholdings, purposes and intentions and arrangements and understandings with each other and with other of Regent's shareholders as the securities laws require.

### A.    **Regent Is Likely to Prevail on the Merits of Its Claims.**

#### 1.    **Regent Will Succeed On Its Section 14(a) Claims.**

Section 14(a) "stemmed from the congressional belief that fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange."[1] *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). The "provision was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381 (1970). "A proxy statement

---

[1] All emphasis is added and all internal quotations are omitted throughout this motion unless otherwise noted.

7

should honestly, openly and candidly state all the material facts, making no concealment of the
purposes for the proposals it advocates.  Unlike poker where a player must conceal his
unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up."
*Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1991).

> To address these broad remedial purposes, Section 14(a) states:

> It shall be unlawful for any person, by the use of the mails or by any means or
> instrumentality of interstate commerce or of any facility of a national securities
> exchange or otherwise, in contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public interest or for
> the protection of investors, to solicit or to permit the use of his name to solicit any
> proxy or consent or authorization in respect of any security (other than an
> exempted security) registered pursuant to Section 12 [§ 78*l*] of this title.

15 U.S.C. § 78n(a).

Further, Rule 14a-3 requires that no solicitation for a proxy shall be made unless the
person solicited receives a publicly filed preliminary or definitive written proxy statement
containing the material required by Schedule 14A.  *See* Rule 14a-101.  In addition, Rule 14a-6
requires the filing and pre-clearance of proxy statements and other soliciting materials with the
SEC.

In this case, Riley solicited more than ten Regent stockholders to demand a special
meeting of the Company's shareholders.  These activities constituted solicitations of proxies
within the meaning of Section 14(a) of the Exchange Act and Rule 14a-1 promulgated
thereunder.  Riley did not furnish any information to Regent's stockholders or make any filings
with the SEC in connection with these proxy solicitations in flagrant violation of federal
securities laws, including Section 14(a) of the Exchange Act and Rule 14a-3 (providing that
"[n]o solicitation subject to this regulation shall be made unless each person solicited is
concurrently furnished or has previously been furnished with:  (1) a publicly-filed preliminary or
definitive written proxy statement containing the information specified in Schedule 14A (§

8

240.14a-101)") and/or Rule 14a-6 (requiring filing of proxy statements and other soliciting materials with the SEC) and/or Rule 14a-12 (requiring filing with the SEC of pre-filing written communications that are made before furnishing a proxy statement meeting the requirements of Rule 14a-3).

On August 9, 2007, Riley published a Press Release announcing that Riley had filed a lawsuit against Regent seeking to compel a special meeting in the Delaware Court of Chancery. Both the lawsuit and the Press Release falsely indicated that Regent had failed to provide a stockholder list and had wrongfully refused to call a special meeting as demanded by the Form Demand Letters. Riley acknowledges in the Press Release that it had been soliciting consents from Regent stockholders all along, acknowledging that it has made "telephone calls" which enabled it "to garner more than 20% of the shareholders to call a special meeting." Thus, the Press Release acknowledges but does not even purport to satisfy Riley's flagrant violation of federal securities laws in connection with Riley's prior solicitation of demands for the stockholder meeting. Moreover, in its Press Release, Riley has finally acknowledged that it "may" seek to solicit proxies in support of its proposals to expand Regent's board and then to elect almost half of its directors who then may fill any vacancy that later occurs.

The timing and content of the Press Release clearly demonstrate that it was directed at Regent's stockholders and was reasonably calculated to influence the stockholders to demand the special meeting and then to vote their proxies in favor of the proposals and nominees proposed by Riley. As such, the Press Release constitutes a solicitation within the meaning of Section 14(a) of the Exchange Act.

On August 10, 2007, Riley filed the Press Release as soliciting materials under Rule 14a-12 under the Exchange Act. However, the Press Release itself constitutes a further violation of federal securities laws because Rule 14a-12 requires that "[a] definitive proxy statement meeting

9

the requirements of Exchange Act Rule 14a-3(a) is sent or given to security holders solicited in reliance on this 14a-12 *before or at the same time* <u>as the forms of proxy, consent or authorization are furnished to or requested from security holders</u>." This did not occur.

Moreover, the Press Release is misleading in characterizing Riley's true intention to seek proxies to support its director candidates on proposals as merely conditional. The Press Release is also materially false and misleading, as are Riley's prior filings on Schedule 13D, for failure to disclose Riley's arrangements, agreements and understandings with SMH and other shareholders who have demanded a special meeting and its intent ultimately to obtain control of the board, to force a sale of the Company and to profit on that sale from the stock they and their group have bought at depressed prices at the expense of other shareholders.

The Press Release was also materially misleading because it failed to disclose that:

>  (a)    Riley had been engaged in proxy solicitation activities since at least June or July 2007 in violation of federal securities laws in connection with its solicitation of the Form Demand Letters;

>  (b)    Riley, along with Mr. Riley, Mr. Ahn and Mr. D'Agostino has engaged in numerous hostile proxy contests for corporate control over the last several years;

>  (c)    Riley's nominees other than Davis were either principals or loyalists who had agreed to serve at Riley's behest in connection with proxy contests for Regent and various other public companies;

>  (d)    Mr. Davis had an arrangement or understanding with Riley that he would be appointed to Regent's board in return for his agreement, in response to Riley's solicitation, to send a Form Demand Letter to Regent;

>  (e)    Mr. Hannan has been censured by the SEC and the NASD in the past;

>  (f)    Riley has had the intention since at least April 2007, of seeking to take Regent private or otherwise obtaining control of its board and acquiring its shares at depressed prices in order to reap the profit after forcing the Company's sale to the detriment of Regent's other shareholders.

Rule 14a-9 generally prohibits fraud in the solicitation of proxies, and provides as follows:

10

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9.

Negligence is the standard of culpability under Section 14(a).[2]   *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 189-90 (3d Cir. 1988), *cert. denied*, 489 U.S. 1054 (1989); *Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761, 777-78 (3d Cir. 1976); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 729 (D. Del. 2000).   An omission or misleading statement of fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A plaintiff need not prove "a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *Id.*  Rather, plaintiff must show "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.*  In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

A "reasonable shareholder would consider the omitted information about Riley's and its group's and nominees background and intentions important in deciding how to vote." *TSC Industries*, 426 U.S. at 449.  A reasonable shareholder made aware of these facts could deduce

---

[2] The heightened pleading standards imposed by the Private Securities Litigation Reform Act do not apply to Rule 14a-9 claims.  *See In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 729 (D. Del. 2000).

that Riley was working with other stockholders who failed to disclose their large stakes –
individually in the case of SMH and as a "group" between Riley, SMH and others – or their
intentions, alone and/or collectively to force Riley's partisans on the board to seek to force the
sale of Regent to the detriment of other shareholders. *See Mendell*, 927 F.2d at 674 (proxy
solicitation seeking approval of merger violated Section 14(a) where controlling stockholders
failed to disclose their motives for and intent to force "a quick sale" where undisclosed personal
motives would be relevant to an assessment of whether sale would be in the best interests of the
company or the shareholders); *SEC v. Parklane Hosiery Co., Inc.*, 558 F.2d 1083, 1087-89 (2d
Cir. 1977) (proxy statement seeking consent to a going private transaction contained material
omissions because it did not disclose that the majority shareholder had personal motivations that
a reasonable shareholder could conclude were the overriding purpose of his scheme to force the
Company's sale); *Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 388 (S.D.N.Y. 1999)
(proxy statement seeking approval of a merger violated Section 14(a) because it did not fully
disclose the financial windfall to the proponents of the merger).

A reasonable shareholder would want to be aware of these omitted facts in choosing
whether to demand a special meeting and deciding how to vote on the bylaw amendments and
candidates proposed by Riley, since such facts could lead Regent's shareholders to conclude that
Riley and SMH were operating out of self-interest, rather than out of the interest of all Regent
shareholders. *See Mendell*, 927 F.2d at 674.

Finally, any claim by Defendants that the proxy solicitation rules do not apply is
unavailing. The alleged proxy violations by Riley and its failure to provide and file proxy
materials have two aspects, (1) the original solicitation of Stockholder Demands and (2) the
subsequent solicitation of proxies in support of Riley's proposals and nominees for the election
of directors.

12

As to the first solicitation, there is no dispute that Riley did not provide or file proxy materials in advance of or at the time it solicited other shareholders to send in the Form Demand Letters, seeking a special meeting. Instead, Riley appears to be contending that it did not have to provide or file proxy materials in connection with the solicitation of the Form Demand Letters for two reasons.

First, Riley appears to claim that it is exempt from the proxy rules because Rule 14a-2(b)(2) exempts "any solicitation made otherwise on behalf of the registrant [i.e., Regent] where the total number of persons solicited is not more than ten". Riley raised this defense during a conference with the Court of Chancery earlier this week.

Second, Riley claims that the solicitation of "demands" is not the solicitation of proxies within the meaning of Section 14(a)(l). This argument was made in a footnote to a letter submitted to the Court of Chancery in opposition to Regent's request to stay the Court of Chancery action pending resolution of the alleged proxy violations asserted here.

Riley is wrong on both counts.

First, as alleged in the complaint, there were 10 different Form Demand Letters submitted on behalf of 35 different beneficial owners. Riley's letter also lists two other shareholders on whose behalf the demand is submitted, listing them separately instead of lumping them together with Riley's investment advisory clients as to whose shares it purports, in its Schedule 13D filing, to possess voting and dispositive control. Moreover, Riley solicited one of Regent's directors/shareholders who declined to submit a demand. So it appears that Riley has solicited more than ten shareholders, and Regent has so alleged.

Second, Riley's contention that soliciting demands is not a proxy solicitation is incorrect. The leading treatise, ARANOW & EINHORN ON PROXY CONTESTS FOR CORPORATE CONTROL, notes that:

Rule 14a-1 defines the term 'Proxy' to include 'every proxy, *consent or authorization* with the meaning of Section 14(a) of the Act. 17 C.F.R. §240.14a-1 (1992). Soliciting requests for a special meeting is seeking an authorization.

ARANOW & EINHORN §4.02[C][6] at 4-23 n.117 (3d ed. 2005).

The treatise continues:

Although the federal proxy rules do not contain specific provisions regulating the solicitation of requests for a special meeting, the SEC has interpreted some of its rules as being applicable to this type of solicitation. For example, the individual or committee undertaking to solicit requests for a special meeting must furnish a statement that meets the applicable disclosure and form requirements imposed with regard to the use of a proxy statement in the ordinary solicitation of proxies for an annual meeting.

In addition, the SEC has required the person or committee soliciting requests for a special meeting to make a statement that, if sufficient requests are received to require the call of the special meeting, that person or committee will undertake a formal solicitation of proxies from the stockholders to accomplish the purposes for which the meeting was called.

*Id.* at 4-23.

As alleged in the complaint, not only has Riley failed to provide any soliciting materials in advance of or contemporaneous with its solicitation of requests for a special meeting – which is a solicitation of authorizations governed by the proxy rules, Riley has also failed – even to this date – to commit to undertaking a formal solicitation of proxies to accomplish the purposes for which the meeting was called, instead merely representing that it "may" do so in the August 9th Press Release.

## 2.    Regent Will Succeed On Its Section 13(d) Claims.

The federal securities laws expressly require any "person" who acquires more than five percent of the outstanding shares of a registered issuer to file a Schedule 13D. Section 13(d) was thus intended "to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." *GAF Corp v. Milstein*, 453 F.2d 707, 717 (2d Cir. 1971). "Disclosure which is false or misleading subverts

this purpose." *Id.* at 720. Congress recognized that "[w]ithout knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision." House Report, 1968 U.S.C.C.A.N. at 2812.

Moreover, under Section 13(d)(3), "when two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a person for the purposes of this subsection." *Rosenberg v. XM Ventures*, 274 F.3d 137, 144 (3d Cir. 2001) (*citing* 15 U.S.C. § 78m(d)(3)). Exchange Act § 13(d), 15 U.S.C. § 78m(d). Congress adopted these provisions in order to "prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the [disclosure] provisions of the statute." H.R. Rep. No. 90-1711 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2811, 2818; S. Rep. No. 550, 90th Cong., 1st Sess. 8 (1967) (the "House Report"). A group's Schedule 13D filing must disclose *inter alia,* any understandings, arrangements, or agreements among shareholders with respect to the stock of the issuer, and their purposes in so doing.

Courts have found group conduct where the parties acted in parallel with an apparent common purpose and prior relationships. *See, e.g., SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1164-65 (D.C. Cir. 1978). The Court need not find a formal agreement; indeed those seeking to avoid disclosure that they are acting as a group are unlikely to enter into a formal agreement. *Bath Indus., Inc. v. Blot,* 427 F.2d 97, 110 (7th Cir. 1970); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 125-26 (2d Cir. 2001); *Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 850 (N.D. Ill. 1987).

Section 13's disclosure requirements are intended to protect shareholders, including those whose votes are being solicited in a proxy contest, by preventing undisclosed groups – such as Riley and SMH – from obtaining proxies without explaining their purposes and intent. Shareholders are entitled to know precisely who is soliciting them and with whom they are

15

working in concert *before* casting a vote.  Thus, once each of Riley and SMH, alone or through

their affiliates, each acquired, directly or indirectly, in excess of five percent of the outstanding

stock of the Company, each was required under Section 13 of the Exchange Act to file a

Schedule 13D disclosing, *inter alia*, the details concerning the amounts of their beneficial

holdings their intentions with respect to their investment in Regent and their allegiance with

other persons as part of any "group."  Moreover, upon a material change in the information

reported, such Schedule 13D filings are required to be promptly amended.

Nonetheless, Defendant SMH has failed to make any of the filings and disclosures

required by Section 13 although SMH and its affiliates have represented that they own in excess

of 5% of the shares of the Company.  Further, both Riley and SMH are in violation of Section

13(d) in that they have failed to disclose that they are acting together, and with other

shareholders including Riley's nominees, Jared Davis and John Ahn, to seek to amend the bylaws

of the company and elect directors including principals and affiliates of Riley to Regent's board.

Riley's Schedule 13D is materially false and misleading in that it fails to disclose its agreements

and understandings with SMH and others, and that

> a) Riley had been engaged in proxy solicitation activities since at least mid-July in connection with its solicitation of the Form Demand Letters;
>
> b) Riley's nominees other than Davis were either principals or loyalists with past board service at Riley's behest in connection with various proxy contests;
>
> c) On information and belief, Davis had an arrangement or understanding with Riley that he would be appointed to Regent's board in return for his agreement, in response to Riley's solicitation, to send a Form Demand Letter to Regent;
>
> d) Mr. Hannan has been censured by the SEC and the NASD in the past;
>
> e) Riley, as well as Mr. Riley, Mr. Ahn and Mr. D'Agostino have been engaged in numerous hostile proxy contests for corporate control over the last several years;

16

f) Riley has had the intention since at least April 2007, of seeking to take Regent private or otherwise obtaining control to the detriment of Regent's other shareholders.

All of this information is required to be disclosed. In sum, Regent is highly likely to succeed on the merits of both its Schedule 13(d) and its Section 14(a) claims.

## B.    Regent Will Suffer Irreparable Injury if the Court Does Not Issue the Temporary Restraining Order.

Regent and its shareholders will suffer irreparable injury if a special meeting is called on the basis of consents solicited in violation of the federal securities laws and if its shareholders are deprived of the opportunity to make a fully informed decision regarding the proposals and candidates Riley plans to put forward at the special meeting. "The threat of an uninformed stockholder vote constitutes irreparable harm." *ODS Technologies, L.P. v. Marshall*, 832 A.2d 1254, 1262-63 (Del. Ch. 2003). Riley's violations of Sections 13 and 14(a) of the Exchange Act will each, independently of one another, result in an uninformed stockholder vote if a temporary restraining order does not issue.

*First*, the failure to provide the proxy materials required by law causes irreparable injury where shareholder proxies are solicited without adequate disclosure, particularly if a change-of-control transaction is affected. *MONY Group, Inc. v. Highfields Capital Management, L.P.*, 368 F.3d 138, 147-48 (2d Cir. 2004). Riley solicited SMH and other Regent shareholders to make a demand for a special meeting without providing any of the required information about itself, its holdings, or its purposes, and without pre-clearing or filing a proxy statement with the SEC. As a result of Defendants' violations of Section 14(a) and Rule 14a-1, Regent shareholders, without the benefit of any of the disclosures to which they were entitled, were requested to force a meeting at which Riley intended to begin to effect a takeover. Unless the meeting and further solicitations without full compliance with the proxy rules is enjoined, Defendants' violations will cause irreparable injury to Regent and its shareholders.

17

*Second*, "[i]rreparable injury results from the use of false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated." *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 287 (S.D.N.Y. 1995); *see also Lichtenberg*, 43 F. Supp. 2d at 390 (S.D.N.Y. 1999). As this Court held in *Edelman v. Salomon*, 559 F. Supp. 1178, 1189 (D. Del. 1983):

> In *Mills v. Electric Auto-Lite*, 396 U.S. 375, 383, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970), the Supreme Court recognized that use of a solicitation which is materially misleading poses the kind of irreparable injury to stockholders which can justify injunctive relief prior to a shareholders' meeting. Where the violations of Section 14(a) are as clear as they are in this case, I believe that it is in the best interest of the stockholders and the public to allow a time for clearing the air and disseminating the information necessary to eradicate false impressions. [] it is preferable for the stockholders to make a decision on how to cast their votes in the election of directors at a time when the confusion [resulting from the misleading proxies] has been cleared up.

Because Regent has shown that the deficiencies in Defendants' proxy solicitations are material, it has established the threat of irreparable harm. *See Krauth*, 890 F. Supp. at 287.

*Finally*, a shareholder seeking control who violates Section 13(d) by failing to provide any of the required disclosure (as is the case with SMH) or failing to reveal its collaboration with a group of shareholders will cause irreparable harm unless enjoined. *ICN Pharmaceuticals, Inc. v. Khan*, 2 F.3d 484, 489 (2d Cir. 1993) ("[a]ny effort to change or affect control of [plaintiff] may be enjoined pending the completion of required Schedule 13D filings"). The specific injury caused by the failure to file a Schedule 13D that is accurate and legally compliant – or at all – is the deprivation of shareholders' "statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions." *Bender v. Jordan*, 439 F. Supp. 2d 139, 177 (D. D.C. 2006). This harm occurs "to [both] shareholders and the investing public" for as long as an undisclosed group continues its activities without completing the proper Schedule 13D filings, or correcting and amplifying misleading Schedule 13D filings. *See ICN Pharms.*, 2 F.3d at 489; *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir.

18

1977).  Accordingly, Defendants' continued failure to reveal their collaboration by making the disclosures required by Section 13(d) represents an added and independent threat of irreparable injury to Regent and its shareholders.

The irreparable injuries caused by Defendants' failure to comply with the proxy rules by failing to provide and file required and not misleading proxy materials, and their continued refusal to file or to file compliant Schedule 13D disclosures cannot be rectified by an action at law.  Congress enacted Section 14(a) in the belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." *Borak*, 377 U.S. at 431.  Regent's shareholders have no adequate remedy at law because they "would have been deprived of their statutory right to be free from deceptive proxy solicitations and their corresponding right to an informed vote" in the absence of injunctive relief. *Lichtenberg*, 43 F. Supp. 2d at 391.  Money damages cannot adequately compensate them for the loss of this fundamental right. *Id.* at 392 (money damages for violation of Section 14(a) "would be less accurate, prompt, complete and efficient [than an injunction] – and thus inadequate").

Similarly, Section 13(d) seeks to protect individual investors against groups that "undertake to acquire shares in a corporation for the purpose of solidifying their own position." *Bender*, 439 F. Supp.2d at 176, citing *Edelson v. Chi'en*, 405 F.3d 520, 626 (7th Cir. 2005). Such protection requires disclosure, not money damages, and cannot easily be by "after-the-fact damages case." *Bender*, 439 F. Supp. 2d at 177, *citing In re Staples Inc.*, 792 A.2d 934, 960 (Del. Ch. 2001).  "A post-hoc evaluation will necessarily require the court to speculate about the effect that certain [disclosure] deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm." *Id.*

19

**C.    The Balancing of Hardships Weighs in Regent's Favor.**

Because Regent has shown that it is likely to succeed on the merits, it need not show that the balance of hardships tips decidedly in its favor.  *See Constructors Ass'n*, 573 F.2d at 815. However, an examination of the facts shows that the balance of hardships clearly weighs in favor of Regent in any event.

Riley has proposed – with the support of those shareholders, including SMH, who submitted Demands in response to Riley's solicitation – a special meeting of the Company's shareholders to occur on September 3.  It is possible that sometime next month the Delaware Court of Chancery may decide whether to set the meeting.  However, the Court of Chancery has no jurisdiction to determine the federal proxy claims.  If Riley and SMH are permitted to proceed with the special meeting and their proposals to amend Regent's bylaws and to seek election of their proposed slate of directors, they would be doing so without the Company's other shareholders having first been provided the proxy materials the securities laws require as a prerequisite for <u>both</u> the original solicitations of the demands to hold the meeting <u>and</u> the solicitation of proxies in favor of the proposals presented and directors nominated by Riley. Moreover, Regent's shareholders will be forced to hold a meeting and vote on issues without receiving full and fair information about Riley and SMH, their ultimate intentions for Regent, their history and their relationships with each other and the director nominees, the arrangements, understandings and agreements they have reached among themselves to act in concert, and what conflicts of interest they may have with the Company's shareholders as a whole.   The shareholders' vote will therefore be tainted with misrepresentations and incomplete and misleading information.

On the other hand, the Defendants will face little to no hardship from this Court's entry of a temporary restraining order. As an initial matter, the Defendants are engaging in illegal and misleading activities to pursue their own interests. But even so, there is no harm to Defendants in maintaining the status quo while Regent's shareholders receive the proxy materials and complete information required by the securities laws and the opportunity, after a reasonable period to review that information to (1) decide whether to call a meeting and (2) if a meeting is called, to decide how to vote on the proposals Riley has put forth. At worst, they will be delayed. This minimal hardship does not rise to the level of hardship Regent will face if it is not given time to protect its shareholders from the Defendants' efforts to evade the proxy rules and conceal their true intentions and concerted activity in support of their campaign to force themselves on the board, so as to force the sale of the Company at an inopportune time, keeping any profits for themselves.[3]

### D.    The Public Interest Favors Entry of the Temporary Restraining Order.

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor

---

[3] Although a security bond may be required as a condition to a court entering a temporary restraining order, there are instances when a court has the discretion to waive the bond requirement. *See* Fed. R. Civ. P. 65(c) ("in such amounts as the court deems proper"). Courts in other circuits have found that a court may "dispense with security where there has been no proof of likelihood of harm to the party enjoined." *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974). As we have shown, the Defendants face little harm, and no monetary harm, from this Court's issuing a temporary restraining order. Defendants will not be harmed by the Court's delaying their pursuit of the illegal Stockholder Proposal, and requiring a bond from Regent will only result in additional hardship to Regent due to Defendants' actions.

This Circuit has found that when a court considers whether to require a bond, it should balance the "equities of the potential hardships that each party would suffer as a result of a preliminary injunction." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996). Particularly, the court should consider "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). Due to the absence of any harm - - much less monetary harm - - to the Defendants, and the further hardships which the Court would impose on Regent if it required a bond, this Court should use its discretion to waive security for this temporary restraining order.

the plaintiff." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994); *see also Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004). Here, the public interest favors entry of the temporary restraining order, because Regent's goal and the public interest are one in the same: fully to apprise the shareholders and "honestly, openly and candidly state all the material facts." *Mendell*, 927 F.2d at 670; *see also Borak*, 377 U.S. at 431 (Section 14(a) "stemmed from the congressional belief that 'fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange'"); *Mills*, 396 U.S. at 381 ("[Section 14(a)] was intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'"). Moreover, a failure to file or to file compliant Schedule 13Ds deprives shareholders of their "statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions." *Bender v. Jordan,* 439 F. Supp. 2d 139, 177 (D.D.C. 2006) This harm occurs "to [both] shareholders and the investing public." *See ICN Pharms.,* 2 F.3d at 489.

## CONCLUSION

For the foregoing reasons, Regent respectfully requests that the Court enter a temporary restraining order, restraining Defendants from (i) proceeding with their proposal at any special meeting of Regent's shareholders and (ii) distributing further misleading and incomplete information to Regent's shareholders.

Dated:  August 17, 2007                     Respectfully submitted,

                                            *Attorneys for Regent Communications, Inc.*

                                            Raymond J. DiCamillo (#3188)
                                            RICHARDS, LAYTON & FINGER, P.A.
                                            One Rodney Square
                                            10th and King Streets
                                            Wilmington, Delaware  19899
                                            Tel:  (302) 651-7700
                                            Fax:  (302) 651-7701

                                            -and-

                                            Laurie B. Smilan
                                            LATHAM & WATKINS LLP
                                            11955 Freedom Drive, Suite 500
                                            Reston, Virginia  20190
                                            Tel:  (703) 456-1000
                                            Fax:  (703) 456-1001

23

**CERTIFICATION PURSUANT TO**
**DISTRICT OF DELAWARE LOCAL RULE 7.1.1**

Counsel for plaintiff has contacted counsel for Riley Investment Partners Master Fund,

L.P. and Riley Investment Management, LLC, pursuant to District of Delaware Local Rule 7.1.1

concerning the subject matter of the attached motion and no agreement has been reached.

Raymond J. DiCamillo (#3188)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 17, 2007, a copy of the foregoing was served by efile on the following attorneys of record:

        David J. Teklits, Esquire
        Kevin M. Coen, Esquire
        Morris, Nichols, Arsht & Tunnell
        1201 North Market Street
        P.O. Box 1347
        Wilmington, Delaware  19899

Raymond J. DiCamillo (#3188)