IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REGENT COMMUNICATIONS, INC.

                Plaintiff,

    *v.*

RILEY INVESTMENT PARTNERS
MASTER FUND, L.P., RILEY
INVESTMENT MANAGEMENT, LLC, and
SMH CAPITAL INC.,

                Defendants.

Civil Action No. 07-499-JJF

---

DECLARATION OF PETER M. STONE IN SUPPORT OF CONSOLIDATED
OPPOSITION BY DEFENDANTS RILEY INVESTMENT PARTNERS
MASTER FUND, L.P. AND RILEY INVESTMENT MANAGEMENT LLC
TO PLAINTIFF REGENT COMMUNICATIONS, INC.'S MOTIONS FOR
(1) TEMPORARY RESTRAINING ORDER; AND (2) EXPEDITED DISCOVERY

---

MORRIS, NICHOLS, ARSHT & TUNNEL LLP
David J. Teklits (#3221)
Kevin M. Coen (#4775)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 351-9292
*Attorneys for Defendants*
*Riley Investment Partners Master Fund, L.P.*
*and Riley Investment Management, LLC*

OF COUNSEL:

PAUL, HASTINGS, JANOFKSY & WALKER LLP
Peter M. Stone
Jay C. Gandhi
Five Palo Alto Square, Sixth Floor
Palo Alto, CA 94306-2155

August 28, 2007

I, Peter M. Stone, declare and state:

1.    I am one of the attorneys for defendants Riley Investment Partners Master Fund, L.P. and Riley Investment Management, LLC (collectively, "Riley").  I am a member in good standing of the bar of California and am competent to testify to the matters set forth herein, which are based on my personal knowledge.  I submit this Declaration in support of Riley's consolidated opposition to plaintiff Regent Communications, Inc.'s motions for (i) temporary restraining order; and (2) expedited discovery.

2.    Attached hereto as Exhibit A is a true and correct copy of Regent Communications, Inc. Form 13-D (April 4, 2007).

3.    Attached hereto as Exhibit B is a true and correct copy of Regent Communications, Inc. Proxy Statement, Schedule 14A (April 9, 2007).

4.    Attached hereto as Exhibit C is a true and correct copy of Regent Communications, Inc. Schedule 13D/A, Amendment No. 1 (June 29, 2007).

5.    Attached hereto as Exhibit D is a true and correct copy of Regent Communications, Inc. Schedule 13D/A, Amendment No. 2 (July 19, 2007).

6.    Attached hereto as Exhibit E is a true and correct copy of Regent Communications, Inc.'s By-laws.

7.    Attached hereto as Exhibit F is a true and correct copy of Regent Communications, Inc. Schedule 13D/A, Amendment No. 3 (August 9, 2007).

8.    Attached hereto as Exhibit G is a true and correct copy of Chancellor Chandler's letter of August 20, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 28th day of August, 2007, at Costa Mesa, California.


*/s/ Peter M. Stone*

———————————————————————
Peter M. Stone

<u>CERTIFICATE OF SERVICE</u>

I, Kevin M. Coen, hereby certify that on August 28, 2007 a copy of the

DECLARATION OF PETER M. STONE IN SUPPORT OF CONSOLIDATED OPPOSITION

BY DEFENDANTS RILEY INVESTMENT PARTNERS MASTER FUND, L.P. AND RILEY

INVESTMENT MANAGEMENT LLC TO PLAINTIFF REGENT COMMUNICATIONS

INC.'S MOTIONS FOR:  (1) TEMPORARY RESTRAINING ORDER; AND (2) EXPEDITED

DISCOVERY was served by electronic filing upon the following attorneys of record:

> Raymond J. DiCamillo, Esquire
> Richards, Layton & Finger
> One Rodney Square
> Wilmington, DE 19801

Kevin M. Coen (#4775)

# EXHIBIT A

SC 13D 1 rgcisc13d.htm SC 13D

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## SCHEDULE 13D
(Rule 13d-2-101)

### INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO RULE 13d-2(a)

(Amendment No. __)[1]

**Regent Communications, Inc.**
(Name of Issuer)

**Common Stock**
(Title of Class of Securities)

758865109
(CUSIP Number)

**Riley Investment Management LLC
Attn: Bryant R. Riley
11100 Santa Monica Blvd.
Suite 810
Los Angeles, CA 90025
(310) 966-1445**
(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

**April 4, 2007**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(b)(3) or (4), check the following box: ☐

Note:  Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

(Continued on following pages)

---

[1] The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Partners Master Fund, L.P. | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* <br>                                           (a) [ ]<br>                                           (b) [X] | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>WC | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>                              [ ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Cayman Islands | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br><br>2,525,018 | |
| | 8 | SHARED VOTING POWER<br><br>-0- | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,525,018 | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>-0- | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,525,018 | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*       [ ] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.5%[1] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>PN | | |

---

[1]     Based on 39,061,497 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at March 5, 2007, as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 16, 2007.

CUSIP No. 758865109            **13D**            Page 3

| | | | | |
|---|---|---|---|---|
| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Management LLC | | | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [ ]<br>(b) [X] | |
| 3 | SEC USE ONLY | | | |
| 4 | SOURCE OF FUNDS*<br>AF | | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | | [ ] | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware | | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER<br><br>2,525,018[1] | | |
| | 8 | SHARED VOTING POWER<br><br>181,222[2] | | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,525,018[1] | | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>181,222[2] | | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,525,018[2] | | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES* | | [x] | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.5%[3] | | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>IA | | | |

1   Because Riley Investment Management LLC has sole investment and voting power over 2,525,018 shares of Common Stock held by Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC may be deemed to have beneficial ownership of these shares.

2   Riley Investment Management LLC has shared voting and dispositive power over 181,222 shares of Common Stock held by its investment advisory clients. However, Riley Investment Management LLC disclaims beneficial ownership of these shares.

3   Based on 39,061,497 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at March 5, 2007, as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 16, 2007.

# 13D

| NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>B. Riley and Co. Inc. | | |
|---|---|---|
| CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [  ]<br>(b) [X] |
| SEC USE ONLY | | |
| SOURCE OF FUNDS*<br>WC | | |
| CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | | [  ] |
| CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware | | |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br><br>200 |
|---|---|---|
| | 8 | SHARED VOTING POWER |
| | 9 | SOLE DISPOSITIVE POWER<br><br>200 |
| | 10 | SHARED DISPOSITIVE POWER |

| AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>200 | |
|---|---|
| CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES* | [  ] |
| PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>0%[1] | |
| TYPE OF REPORTING PERSON*<br><br>BD | |

---

1    Based on 39,061,497 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at March 5, 2007, as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 16, 2007.

# 13D

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Bryant R. Riley | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [ ]<br>(b) [X] |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | | [ ] |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br><br>2,525,018[1] | |
| | 8 | SHARED VOTING POWER<br><br>181,422[2] | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,525,018[1] | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>181,422[2] | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,525,018[2] | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES* | | [x] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.5%[3] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>IN | | |

1   Because Riley Investment Management LLC has sole voting and investment power over Riley Investment Partners Master Fund, L.P.'s security holdings and Mr. Riley, in his role as the sole manager of Riley Investment Management LLC, controls its voting and investment decisions, each of Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC, and Mr. Riley may be deemed to have beneficial ownership of the 2,525,018 shares of Common Stock held by Riley Investment Partners Master Fund, L.P.

2   Riley Investment Management LLC has shared voting and dispositive power over 181,222 shares of Common Stock owned by its investment advisory clients. Although Mr. Riley controls Riley Investment Management LLC's voting and investment decisions for its investment advisory clients, Mr. Riley disclaims beneficial ownership of these shares. B. Riley and Co. Inc. has sole voting and dispositve power over 200 shares of Common Stock. Although Mr. Riley is the controlling shareholder and Chairman of B. Riley & Co., Inc., Mr. Riley disclaims beneficial ownership of these shares.

CUSIP No. 758865109                **13D**                      Page 6

3     Based on 39,061,497 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at March 5, 2007, as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on March 16, 2007.

CUSIP No. 758865109          **13D**          Page 7

**Item 1.**     **Security and Issuer**

         Common Stock of Regent Communications, Inc. ("Common Stock")
         2000 Fifth Third Center
         511 Walnut Street
         Cincinnati, Ohio 45202

**Item 2.**     **Identity and Background**

     (a)

         (i)     Riley Investment Partners Master Fund, L.P. (Cayman Islands limited partnership)
                 Riley Investment Management LLC (Delaware limited liability company)
                 Mr. Bryant R. Riley (individual residing in California)
         (ii)    B. Riley and Co. Inc. (Delaware corporation)

     (b)

         (i)     11100 Santa Monica Blvd.
                 Suite 810
                 Los Angeles, CA 90025

         (ii)    11100 Santa Monica Blvd.
                 Suite 800
                 Los Angeles, CA 90025

     (c)        Mr. Riley manages and owns all of the outstanding membership interests of Riley Investment Management LLC ("RIM"), an SEC registered investment adviser. RIM is the investment adviser to and general partner of Riley Investment Partners Master Fund, L.P. ("RIP"). RIM is the investment advisor to other clients pursuant to investment advisory agreements. Mr. Riley is the controlling shareholder and Chairman of B. Riley and Co. Inc. ("BRC").

     (d)        N/A

     (e)        N/A

     (f)        United States

**Item 3.**     **Source or Amount of Funds or Other Consideration**

         RIP's purchases were made with its funds.

**Item 4.**     **Purpose of the Transaction**

         The Reporting Persons acquired Issuer's securities reported on this Schedule 13D because they believed such securities represented an attractive investment.

         On April 4, 2007, RIM sent a letter to the Issuer's Board of Directors. In the letter, RIM expressed its concerns on the performance of the Issuer's shares and its views regarding the most efficient way for the Issuer to maximize shareholder value. RIM expressed that it believes that selling the Issuer may offer the best alternative to realize shareholder value, and requested that the management discuss with RIM it's views on options with respect to a sale of the Issuer. The foregoing description of the letter is qualified in its entirety by reference to the letter attached as Exhibit A.

# 13D

The Reporting Persons may, from time to time, evaluate various other alternatives that they might consider in order to influence the performance of the Issuer and the activities of its Board of Directors. Depending on various factors, the Reporting Persons may take such actions as they deem appropriate including, without limitation, engaging in discussions with management and the Board of Directors of the Issuer, communicating with other stockholders, making proposals to the Issuer concerning the capitalization and operations of the Issuer, seeking representation on the Board of Directors, purchasing additional shares of Common Stock or selling some or all of their shares of Common Stock or seeking to make a significant equity investment or to otherwise acquire the Issuer.

The Reporting Persons may also determine to change their investment intent with respect to the Issuer in the future. The Reporting Persons intend to vote their respective shares of Common Stock individually as each Reporting Person deems appropriate from time to time. In determining whether to sell or retain their shares of Common Stock, the applicable Reporting Person will take into consideration such factors as it deems relevant, including without limitation Issuer's business and prospects, anticipated future developments, existing and anticipated market conditions, general economic conditions, and other opportunities available to the Reporting Person. The Reporting Persons reserve the right to acquire additional securities from Issuer in the open market, in privately negotiated transactions, or otherwise, to dispose of all or a portion of its holdings in Issuer's securities, or to change their intention with respect to any or all of the matters referred to in this Item 4.

**Item 5.**     **Interest in Securities of the Issuer**

(a)     With respect to each Reporting Person, see the response set forth in Rows 11 and 13, including the footnotes thereto.

(b)     See Item 5(a) and, with respect to each Reporting Person, the responses to Rows 7 through 10 set forth for such Reporting Person on the cover pages hereto.

(c)     In the ordinary course of business, BRC effects transactions in connection with its ordinary course market making activities, as well as for customer transactions. The following are transactions effected by the other Reporting Persons in Common Stock that have taken place in the past 60 days.

| Master | Trade Date | Trans Code | Quantity | Price |
|--------|-----------|-----------|----------|-------|
|  | 3/9/2007 | BY | 10,681 | 2.975 |
|  | 3/16/2007 | BY | 67,481 | 2.9 |
|  | 3/19/2007 | BY | 23,418 | 2.9423 |
|  | 3/20/2007 | BY | 89,195 | 2.95 |
|  | 3/21/2007 | BY | 93,300 | 2.95 |
|  | 3/23/2007 | BY | 187 | 2.9 |
|  | 3/28/2007 | BY | 1,189,344 | 2.95 |
|  | 3/30/2007 | BY | 435,431 | 2.95 |
|  | 3/30/2007 | BY | 9,330 | 3.22 |

**13D**

| Investment Advisory Client | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 3/9/2007 | SL | 10,681 | 2.975 |
| | 3/16/2007 | BY | 4,846 | 2.9 |
| | 3/19/2007 | BY | 1,682 | 2.9423 |
| | 3/20/2007 | BY | 6,405 | 2.95 |
| | 3/21/2007 | BY | 6,700 | 2.95 |
| | 3/23/2007 | BY | 13 | 2.9 |
| | 3/28/2007 | BY | 85,408 | 2.95 |
| | 3/30/2007 | BY | 670 | 3.22 |
| | 3/30/2007 | BY | 31,269 | 2.95 |

(d)  As the beneficial owner of 181,222 of the Issuer's Common Stock, RIM's advisory clients are entitled to any dividends or proceeds paid, not any of the Reporting Persons.

(e)  Not applicable.

**Item 6.  Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

The relationships between Mr. Riley, RIM, BRC and RIP are described above under Item 2(c) above. The relationship between RIM and other investment advisory clients are described under Item 2(c) above.

**Item 7.  Material to be filed as Exhibits**

EXHIBIT A:  Letter to Board of Directors dated April 4, 2007

CUSIP No.  758865109                     **13D**                     Page 10

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: April 4, 2007

<div style="margin-left:40%">

Riley Investment Partners Master Fund, L.P.
By: Riley Investment Management LLC, its General
   Partner
By:  /s/ Bryant R. Riley
   Bryant R. Riley, Managing Member

Riley Investment Management LLC

By:  /s/ Bryant R. Riley
   Bryant R. Riley, Managing Member

B. Riley and Co. Inc.

By: _s/ Bryant R. Riley_
  Bryant R. Riley, Chairman

By:  /s/ Bryant R. Riley
   Bryant R. Riley

</div>

**EXHIBIT A**

# Riley Investment Management, LLC

11100 Santa Monica Boulevard, Suite 810 Los Angeles, CA 90025
Phone (310) 966-1445 Fax (310) 966-1096

April 4, 2007

Regent Communications, Inc.
William Stakelin & Board of Directors
2000 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202

Dear Sirs:

Riley Investment Management owns approximately 7% of Regent Communications' common shares. We are writing you to express our view regarding the most efficient way to maximize shareholder value. We have been encouraged by the Company's strong operational performance and recent strategic acquisitions. However, we acknowledge that Regent Communications' value is consistently been overshadowed by negative public sentiment to the terrestrial radio broadcasting market in general. We also believe that Regent Communications' small size relative to its public company costs makes it difficult for the Company to realize value as an independent public entity. We therefore believe that selling Regent Communications may offer the best alternative to realizing shareholder value. On the low end, we believe that a sale to financial buyers would yield a price of $4.50 per share or approximately a 50% premium to current stock price. On the high end, we believe that a sale to strategic buyers could yield a price of over $6.00 per share or a 100% premium. As large shareholders of Regent Communications, we would like to discuss with management our views on options with respect to the sale of the Company. We currently sit on the board of five public companies and have had great success in helping our companies navigate through strategic alternative review processes.

As we are sure you are aware, over the past several years Regent Communications' stock price has declined substantially from well over $10 per share to $3 per share currently, a loss of over 70%. Despite posting consistent organic growth rates which have outpaced the terrestrial radio industry's average, Regent Communications' public market value has continued to decline. Furthermore, the board of directors' attempt to increase shareholder value by buying back approximately 3.6 million shares in 2006, at an average price of $4.8 per share, has not materially affected Regent Communications' stock price. We also recognize that the recent acquisition of the Buffalo market stations, which operate at Broadcasting Cash Flow margins of above 50% and that are estimated to add 300 to 400 basis points to Regent Communications pro-forma blended station operating margin in 2007, has added substantial value to the Company but again has been ignored by the public markets.

More importantly, taking into account Regent Communications' public costs in relation to its small revenue base, we believe that the Company should not remain an independent public

CUSIP No.  758865109                     **13D**                          Page 12

William Stakelin & Board of Directors
Regent Communications, Inc.
April 4, 2007

company. With revenues of around $100 million, Regent Communications spends an estimated $2 to $2.5 million to remain public or roughly 8% of its EBITDA. As a private company or part of a larger public entity, Regent would benefit from eliminating these expenses and could also deploy the capital to grow the business further. Applying an EBITDA multiple of around 11.5x to this level of cost saving, inline with the valuation multiples ascribed to Regent Communications' closest publicly traded comparables, would imply unlocking $23 to $28 million of value.

Consequently, we believe the board of directors should pursue selling Regent Communications' assets to larger radio station operators. Examining recent deal multiples conducted in Regent Communications' markets, it seems clear to us that the Company is worth substantially more to strategic buyers, who can benefit from the elimination of fixed corporate overhead, while running at overall lower gearing levels. Taking into account the negative outlook ascribed by public markets to the radio market in general, it is our view that Regent Communications will be hard pressed to yield better returns to shareholders in the foreseeable future while remaining an independent publicly traded company. We believe that such strategic alternatives offer shareholders the best prospects of maximizing value on their investment, value that cannot be realized by remaining an independent public company. We would welcome the opportunity for discussions with the board of directors and senior management team, and look forward to your feedback.

Sincerely,

/s/ John Ahn
John Ahn
Principal
Riley Investment Management LLC

# EXHIBIT B

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A

## INFORMATION REQUIRED IN PROXY STATEMENT
## SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No.  )

Filed by the Registrant ☑
Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to §240.14a-12

## REGENT COMMUNICATIONS, INC.
### (Name of Registrant as Specified In Its Charter)

### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  (1)  Title of each class of securities to which transaction applies:

  (2)  Aggregate number of securities to which transaction applies:

  (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  (4)  Proposed maximum aggregate value of transaction:

  (5)  Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which

the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

_____

(2) Form, Schedule or Registration Statement No.:

_____

(3) Filing Party:

_____

(4) Date Filed:

_____

Table of Contents

### REGENT COMMUNICATIONS, INC.
2000 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

April 9, 2007

Dear Stockholder:

You are cordially invited to attend the 2007 Annual Meeting of Stockholders of Regent Communications, Inc. to be held on Wednesday, May 9, 2007, at 10:00 a.m., local time, at The Metropolitan Club, 50 East RiverCenter Boulevard, 19th Floor, Covington, Kentucky.

Business items to be acted upon at the 2007 Annual Meeting are the election of five directors to serve until the 2008 Annual Meeting, the approval of the appointment of the independent registered public accounting firm for the Company and the transaction of any other business properly brought before the meeting. We will also be pleased to report on the affairs of the Company and to offer stockholders the opportunity to present questions and comments of general interest.

We encourage you to read the accompanying Proxy Statement carefully and to complete, sign and return your proxy in the postage-prepaid envelope provided, even if you plan to attend the Annual Meeting. Returning your proxy to us will not prevent you from voting in person at the meeting, or from revoking your proxy and changing your vote at the meeting, if you are present and wish to do so.

The directors and officers of Regent Communications, Inc. appreciate your continuing interest in the business of the Company and hope that you can join us at the 2007 Annual Meeting.

Sincerely,

/s/ William L. Stakelin

William L. Stakelin
*President and*
*Chief Executive Officer*

Table of Contents

## REGENT COMMUNICATIONS, INC.
2000 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD MAY 9, 2007

The 2007 Annual Meeting of Stockholders of Regent Communications, Inc., a Delaware corporation (the "Company"), will be held on Wednesday, May 9, 2007, at 10:00 a.m., local time, at The Metropolitan Club, 50 East RiverCenter Boulevard, 19th Floor, Covington, Kentucky, for the purpose of considering and acting on the following:

1. A proposal to elect five directors to serve until the next Annual Meeting of Stockholders and until their respective successors have been duly elected and qualified.

2. A proposal to approve the appointment of the firm of Deloitte & Touche LLP (independent auditor) to serve as the independent registered public accounting firm for the Company for the year ending December 31, 2007.

3. Such other business as may properly come before the Annual Meeting or any adjournment or adjournments thereof.

Holders of record of the Company's common stock at the close of business on March 30, 2007, are entitled to notice of and to vote at the Annual Meeting.

Enclosed with this Notice are a Proxy Statement, proxy card and the Company's Annual Report for the year ended December 31, 2006.

By Order of the Board of Directors:

/s/ William L. Stakelin

April 9, 2007

William L. Stakelin
*President and Chief Executive Officer*

**WHETHER OR NOT YOU PLAN TO ATTEND THE ANNUAL MEETING IN PERSON, PLEASE COMPLETE, DATE, SIGN AND RETURN THE ENCLOSED PROXY IN THE ACCOMPANYING POSTAGE-PREPAID ENVELOPE. YOU MAY REVOKE YOUR PROXY IN WRITING OR AT THE ANNUAL MEETING IF YOU WISH TO VOTE IN PERSON.**

## TABLE OF CONTENTS

ANNUAL MEETING OF STOCKHOLDERS TO BE HELD MAY 9, 2007
ELECTION OF DIRECTORS
EXECUTIVE OFFICERS
COMPENSATION DISCUSSION AND ANALYSIS
EXECUTIVE COMPENSATION
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
OTHER SECURITIES FILINGS
SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
REPORT OF THE AUDIT COMMITTEE
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
STOCKHOLDER PROPOSALS FOR 2008 ANNUAL MEETING
OTHER MATTERS

**Table of Contents**

# REGENT COMMUNICATIONS, INC.

2000 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

## PROXY STATEMENT

## ANNUAL MEETING OF STOCKHOLDERS TO BE HELD MAY 9, 2007

The Board of Directors of Regent Communications, Inc. ("Regent" or the "Company") is soliciting proxies from its stockholders for use at the Annual Meeting of Stockholders to be held on May 9, 2007, and at any adjournments thereof. This Proxy Statement and the accompanying proxy card are first being mailed to stockholders on or about April 9, 2007. The record date for purposes of determining those stockholders entitled to notice of and to vote at the Annual Meeting has been fixed by the Board of Directors as March 30, 2007.

All properly executed proxies received pursuant to this solicitation and not revoked before they are voted will be voted as designated at the Annual Meeting, and those not designated will be voted **"FOR"** the director nominees named therein, **"FOR"** the proposal to approve Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ending December 31, 2007, and in the proxy holders' best judgment on any other matter that may properly come before the Annual Meeting and any adjournments thereof. Any stockholder giving a proxy may revoke it at any time before it is voted by giving to the Company notice of its revocation, in writing or in open meeting, or by delivering a duly executed proxy bearing a later date.

The expense of this solicitation, which will include the cost of assembling and mailing the Notice, the Proxy Statement and proxy card, will be borne by the Company. Proxies will be solicited primarily by mail but may also be solicited through personal interview, telephone and telecopy by directors, officers and regular employees of Regent, without special compensation. The Company expects to reimburse banks, brokers and other persons for their reasonable out-of-pocket expenses in handling proxy materials for beneficial owners of the Company's common stock.

The Annual Report for the year ended December 31, 2006, including financial statements, is being mailed with this Proxy Statement.

As of March 30, 2007, there were outstanding 38,635,426 shares of Regent common stock, and each such share is entitled to one vote, either in person or by proxy, on each matter of business to be considered at the Annual Meeting. A majority of the outstanding shares entitled to vote at the Annual Meeting, present in person or by proxy, will constitute a quorum.

Table of Contents

## ELECTION OF DIRECTORS

### Size of the Board of Directors

During the last half of the 2006 year, the Nominating and Corporate Governance Committee continued its ongoing evaluation of the progress of the Company and the Board in ensuring that their corporate governance practices and policies fully comply with both the mandates and the spirit of the Sarbanes-Oxley Act of 2002 and related rules and regulations of the Securities and Exchange Commission and the Nasdaq Stock Market. Consistent with that objective, the Committee reviewed the actions, time commitments and qualifications, including independence, required of directors going forward to comprise an effective Board of Directors for the Company. In its deliberations, the Committee took into consideration the fact that William H. Ingram and Andrew J. Armstrong, Jr. had resigned from the Company's Board of Directors in August 2006 after the Company's repurchase of the Regent common shares owned by Waller-Sutton Media Partners, L.P. Messrs. Ingram and Armstrong were members of Waller-Sutton Media, LLC, the general partner of Waller-Sutton Media Partners, L.P. Upon consideration of all factors, the Nominating and Corporate Governance Committee concluded that the Company's Board would be able to function effectively and efficiently with five directors, and accordingly, decided to maintain the size of the Board at that number. The Board and the Company are grateful for the valuable contributions that Messrs. Ingram and Armstrong provided to the Company over their years of service.

### Procedures for Nomination of Director Candidates

Director candidates are nominated by the Company's Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee's charter directs the Committee to investigate and assess the background and skills of potential candidates. The Committee is empowered to engage a third party director search firm to assist, but the Committee to date has not engaged or paid any fees to any such firm. The Committee believes that the existing directors and executive officers of the Company have significant networks of business contacts from which suitable candidates will be identified when necessary.

Generally, once a candidate is identified for serious consideration, one or more members of the Nominating and Corporate Governance Committee will initially interview such candidate to evaluate the candidate's qualifications and level of potential interest in serving on the Company's Board of Directors. If the candidate merits further consideration, meetings then will be arranged to the fullest extent feasible and practical, individually or collectively, with other members of the Nominating and Corporate Governance Committee, other directors and the Company's Chief Executive Officer and other executive officers. The Nominating and Corporate Governance Committee next would obtain feedback from all persons who participated in those meetings and then determine whether or not to nominate the candidate.

In addition, the Company's Corporate Governance Guidelines provide that stockholders of the Company may propose nominees for election at Regent's Annual Meeting of Stockholders for consideration by the Nominating and Corporate Governance Committee upon submitting the names and qualifications of such persons to the Committee no later than December 31 of any year. Submissions must be made to the Committee c/o Regent Communications, Inc., Secretary, 2000 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio 45202, which submissions will then be forwarded to the Nominating and Corporate Governance Committee. The Committee would then evaluate the possible nominee and would consider such person in comparison to all other candidates. No such stockholder nominations have been received by the Company for this Annual Meeting or at any other time. Accordingly, no rejections or refusals of stockholder nominated candidates have been made.

2

Table of Contents

## Considerations in Evaluating Candidates for Directors

The Company's Corporate Governance Guidelines set forth the following guidelines for the qualifications desired for directors: highest personal and professional ethics and integrity; willingness and ability to devote sufficient time to carrying out the duties of a director effectively; and the diversity of experience, age, skills and other factors possessed by the candidate that will best serve the needs of the Company and its stockholders in combination with the other directors. In addition, a director of the Company generally should not serve on more than three other public company boards of directors.

## Nominees for Directors to be Elected at Annual Meeting

At the Annual Meeting, five directors will be elected and will hold office until the next Annual Meeting of Stockholders and until their respective successors are duly elected and qualified. The Company's Nominating and Corporate Governance Committee of the Board of Directors has nominated all five of the continuing incumbent directors. All five nominees have agreed to serve if elected.

Below is set forth, with respect to each nominee for director of the Company, his age, principal occupation during the past five years, other positions he holds with the Company, if any, and the year in which he first became a director of Regent. Each of the nominees is currently a director of the Company.

## Information Regarding Director Nominees

### WILLIAM L. STAKELIN (Age 64)

Mr. Stakelin has been President, Chief Executive Officer and a director of Regent since September 2005. Prior to that time, Mr. Stakelin served as President, Chief Operating Officer, Secretary and a director of Regent since its incorporation in November 1996. He served as executive vice president and chief operating officer of a privately-held radio broadcast company under the name "Regent Communications, Inc." ("Regent I"), which acquired and operated 23 radio stations from 1995 until its merger into Jacor Communications, Inc. in February 1997. Mr. Stakelin served as president and chief executive officer of Apollo Radio, Ltd., a privately held radio broadcast company, which he co-founded in 1988 and which acquired and operated nine radio stations prior to its sale to Regent I in 1995. He currently serves as a director of the Radio Advertising Bureau and the Bayliss Foundation, both of which are industry trade associations.

### ANDREW L. LEWIS, IV (Age 50)

Mr. Lewis has served as a director of Regent since May 2005. Since 1989, Mr. Lewis has been an independent business consultant and entrepreneur providing a range of consulting services to start-up and other businesses in the areas of strategic planning, financing and marketing. Mr. Lewis also serves as a board member and advisor since January 1986 to Brynwood Partners, a privately-held investment partnership. From 1986 to 2000, Mr. Lewis served as a director of Air Express International Corporation, a transportation logistics provider, and from 1987 to 2000, he served as a director of Hurco Companies, Inc., an automation company in the metal cutting and forming industry: both of which companies were publicly traded and investments of Brynwood Partners I, L.P. From July 1993 to December 1995, he also served as managing partner of KRR Partners, L.P., an investment partnership.

### TIMOTHY M. MOONEY (Age 59)

Mr. Mooney has served as a director of Regent since July 2003. Since August 2004, he has been the Vice President of Operations of St. Xavier High School in Cincinnati, Ohio, one of the nation's largest Jesuit high schools. From May 1996 through December 2002, Mr. Mooney served as executive

3

Table of Contents

vice president and chief financial officer of Kendle International Inc., a publicly traded company that provides clinical research services to pharmaceutical and biotechnology companies. He also served as a director of Kendle International beginning in January 1997 until he retired from Kendle in December 2002. Prior to joining Kendle International, Mr. Mooney served as the chief financial officer of two other publicly traded companies, The Future Now, Inc., a computer reseller, and Hook-SupeRx, Inc., a retail drugstore chain. Prior to May 1988, he was a partner with Coopers & Lybrand, a predecessor to PricewaterhouseCoopers LLP.

**WILLIAM P. SUTTER, JR.** (Age 49)

Mr. Sutter has served as a director of Regent since December 1999 and as its Chairman of the Board since September 2005. He is currently a principal with Hopewell Ventures, a Chicago-based private equity firm of which he is a founder. He is also an Adjunct Professor of Finance at Northwestern's Kellogg Graduate School of Management. From 1984 to 2001, Mr. Sutter served as a vice president of Mesirow Financial Services, Inc., a financial services firm and the general partner of Mesirow Capital Partners VII. He currently serves as a director of three privately-held companies.

**JOHN H. WYANT** (Age 60)

Mr. Wyant has served as a director of Regent since June 1998. Mr. Wyant has served as president of Blue Chip Venture Company, a venture capital investment firm, since its formation in 1990. Blue Chip Venture Company, together with its affiliates, manages an aggregate of approximately $600 million of committed capital for investment in privately-held high-growth companies. Mr. Wyant is also a director of a number of privately-held companies.

None of the above named nominees for director have any family relationships with any other nominee or with any executive officers of the Company.

**Vote Required for Election of Directors**

Delaware law, under which the Company is incorporated, does not require a minimum number of votes for the election of a director. The Company's bylaws, however, provide that the individuals receiving the greatest number of votes shall be elected as directors. Thus, abstentions and shares not voted by brokers and other entities holding shares on behalf of the beneficial owners will have no effect in the election of directors.

It is the intention of the persons named as proxy holders in the proxy card to vote for the election of all nominees. The Board of Directors does not know of any nominee who will be unable to stand for election or otherwise serve as a director. If for any reason any nominee shall be unable to serve, the shares represented by proxy will be voted for such substitute nominee as the Board of Directors recommends, unless an instruction to the contrary is indicated on the proxy card.

**The Board of Directors unanimously recommends that you vote "FOR" the election of the above listed five nominees for director.**

**Meetings of the Board of Directors and Attendance**

During the year ended December 31, 2006, the Board held five regularly scheduled meetings and four special meetings. Each current director attended or participated in at least 95% of the meetings of the Board of Directors and all committees on which he served in 2006.

The Board also regularly holds executive sessions of those members of the Board who meet the then current standards of independence. Such meetings have occurred during scheduled meetings of the

4

Table of Contents

full Board of Directors, at which time all members of the Company's management team and non-independent directors are excused. The independent directors also could convene an executive session separately from any scheduled Board meeting if deemed appropriate. In 2006, the independent directors held four executive sessions in conjunction with regularly scheduled Board meetings. Executive sessions of the Board of Directors are chaired by the independent director as determined by the independent directors collectively to have the requisite experience and knowledge regarding the matters being discussed in a particular executive session. The Board of Directors believes that this practice provides for effective leadership of all executive sessions without the need to designate a lead or presiding director.

The Company does not maintain a policy regarding director attendance at the Company's Annual Meetings of Stockholders. Of the seven directors elected at the May 10, 2006 Annual Meeting of Stockholders, two directors were in attendance at the meeting.

**Determination of Independence**

The Board of Directors has determined that Messrs. Lewis, Mooney, Sutter and Wyant are independent directors in accordance with the standards of Rule 4200(a)(15) of the National Association of Securities Dealers listing standards for issuers whose securities are listed on the Nasdaq Stock Market. In July 2005, the Board determined to allow the separation of the roles of Chairman of the Board and Chief Executive Officer. The Board then elected Mr. Sutter to be the Company's independent Chairman of the Board. Mr. Stakelin is not an independent director based on his employment by the Company within the past three years. Accordingly, 80% of the Company's Board of Directors will be comprised of independent directors assuming the election at the Annual Meeting of all nominees named in this Proxy Statement.

**Committees of the Board of Directors**

The Board of Directors has a standing Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee as described below.

*Audit Committee.* The Audit Committee currently consists of three directors, Messrs. Mooney (Chairman), Lewis and Sutter, all of whom are independent directors as discussed above and satisfy the audit committee qualification standards contained in Rule 4350(d)(2) of the National Association of Securities Dealers listing standards. The Board of Directors also has determined that Mr. Mooney is an audit committee financial expert.

The Audit Committee's functions include the engagement of the Company's independent registered public accounting firm, review of the results of the audit engagement and the Company's financial results, review of the auditors' independence, review of the effectiveness of the Company's internal controls and similar functions, and the approval of all auditing and non-auditing services performed by the independent auditors of the Company. The Audit Committee's charter can be found on the Company's website at www.regentcomm.com by selecting the "Investor Information" tab and then selecting "Corporate Governance" under the "Inside Regent" heading. The Audit Committee held eight meetings during 2006.

*Compensation Committee.* The Compensation Committee currently consists of three directors, Messrs. Wyant (Chairman), Lewis and Sutter, all of whom are independent directors as discussed above. The basic function of the Compensation Committee is to review and establish salaries, bonuses and other elements of compensation of the Company's chief executive officer and other executive officers, as well as to determine equity incentive awards for such officers and other key employees. The Compensation Committee has adopted a charter, which can be found on the Company's website at www.regentcomm.com by selecting the "Investor Information" tab and then selecting "Corporate

5

Table of Contents

Governance" under the "Inside Regent" heading. The Compensation Committee held three meetings during 2006.

*Nominating and Corporate Governance Committee.* The Nominating and Corporate Governance Committee currently consists of four directors, Messrs. Sutter (Chairman), Lewis, Mooney, and Wyant, all of whom are independent as discussed above. The primary purpose of the Nominating and Corporate Governance Committee is to develop and recommend to the Board corporate governance policies and guidelines for the Company, and to nominate directors for election to the Board and appointment to committee memberships. The Nominating and Corporate Governance Committee has adopted a charter, which can be found on the Company's website at www.regentcomm.com by selecting the "Investor Information" tab and then selecting "Corporate Governance" under the "Inside Regent" heading. The Nominating and Corporate Governance Committee held two meetings during 2006.

## Compensation Committee Interlocks and Insider Participation

For the year ended December 31, 2006, the Compensation Committee consisted of three members, Messrs. Wyant, Sutter and Lewis. No executive officer of the Company serves on any board of directors or compensation committee of any entity that compensates Messrs. Wyant, Sutter or Lewis. The Company is a party to the agreement described below, which agreement could provide registration rights to entities affiliated with Mr. Wyant.

The Company is a party to a registration rights agreement dated as of June 15, 1998, as amended, with Blue Chip Capital Fund II Limited Partnership, Blue Chip Capital Fund III Limited Partnership, Miami Valley Venture Fund L.P., and other entities. Under this agreement, upon a demand made by parties to the agreement that hold at least 10% of the Company's outstanding common stock, Regent is required to register under the Securities Act of 1933 the shares of the Company's common stock owned by these holders. In addition, the parties to the agreement have the right to join in certain registrations of Regent's equity securities. None of the parties to the registration rights agreement currently hold 10% of the Company's outstanding common stock.

## Communications with Directors

The Company's stockholders may communicate directly in writing with the Company's Board of Directors by sending a letter to the Board at Regent Communications, Inc., Board of Directors, 2000 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio 45202. Your letter should state that you are a stockholder of Regent Communications, Inc. and provide evidence of your stock ownership if your shares are not registered in your own name. All such letters will be reviewed by a senior member of the Company's accounting and finance department. Depending on the subject matter of your letter, management will: forward the communication to the full Board or the director to whom the letter is addressed; attempt to handle the inquiry directly, for example, where it is a request for information about the Company or it is related to your stock holdings; or not forward the communication if it relates to a clearly irrelevant, improper or frivolous topic. At each Board meeting, a member of management will summarize for the full Board of Directors all non-forwarded letters and make those letters available to any director who indicates a desire to see the actual communication.

## Code of Business Conduct and Ethics

The Board of Directors has adopted the Regent Communications, Inc. Code of Business Conduct and Ethics applicable to all directors and Company employees, including the chief executive officer and all senior financial officers and employees. The Code can be found on the Company's website at www.regentcomm.com by selecting the "Investor Information" tab and then selecting "Corporate Governance" under the "Inside Regent" heading.

Table of Contents

## EXECUTIVE OFFICERS

The executive officers of the Company, their ages, and the positions they hold with the Company are as follows:

| Name | Age | Position |
|------|-----|----------|
| William L. Stakelin | 64 | President and Chief Executive Officer |
| Anthony A. Vasconcellos | 42 | Executive Vice President and Chief Financial Officer |

Executive officers are elected annually by the Board of Directors and serve at the discretion of the Board. Information with respect to the business experience, principal occupations during the past five years and affiliations of the executive officers of Regent who are not also directors is set forth below. Information regarding Mr. Stakelin is set forth above under the caption "ELECTION OF DIRECTORS — Information Regarding Director Nominees."

*Anthony A. Vasconcellos* joined Regent in September 1998 as Vice President and Chief Financial Officer. From December 2000 until August 2005, he served as Senior Vice President and Chief Financial Officer for Regent. In September 2005, he became Executive Vice President and Chief Financial Officer for the Company. From October 1991 until joining Regent in 1998, he was employed by LensCrafters, Inc., a highly acquisitive optical retail company, which by 1998 had 800 retail stores and $1.2 billion in revenues. From February 1992 to March 1994, Mr. Vasconcellos served as controller of LensCrafters' Canadian subsidiary. In 1994, he was repatriated and assumed oversight of financial reporting and financial systems for LensCrafters while leaving to join Regent in 1998. From July 1987 to September 1991, Mr. Vasconcellos served as an auditor for the international accounting firm of Coopers & Lybrand, a predecessor to PricewaterhouseCoopers LLP. Mr. Vasconcellos currently serves as the vice chairman of the board of directors of the Broadcast Cable Financial Management Association, an organization that is composed of and represents financial professionals in the media industry.

## COMPENSATION DISCUSSION AND ANALYSIS

### Introduction and Corporate Governance

The Compensation Committee is comprised of three independent members of the Board of Directors: John H. Wyant, Chairman; Mr. William P. Sutter, Jr.; and Mr. Andrew L. Lewis, IV. The Compensation Committee operates in accordance with the Compensation Committee Charter, which states that the Committee's primary purpose is to:

- Oversee the Company's overall compensation policies and the application of those policies;

- Determine the compensation of the Company's chief executive officer ("CEO") and the Company's other executive officers, including but not limited to the Company's chief operating officer and chief financial officer, such compensation to include salary, bonus, incentive awards and all other compensatory arrangements or benefits to be provided to the CEO and other executive officers from time to time;

- Oversee management's determination of salaries, bonuses and other elements of compensation provided to the Company's non-executive officers and other employees;

- Determine stock option and other incentive grants to the Company's non-executive officers and other employees; and

7

Table of Contents

- Prepare the annual report on executive compensation for inclusion in the Company's proxy statement.

The Compensation Committee's Charter can be found on the Regent Communications, Inc. website at www.regentcomm.com by selecting the "Investor Information" tab and then selecting "Corporate Governance" under the "Inside Regent" heading. The Compensation Committee reviews its Charter annually.

The Compensation Committee, at its discretion, has the ability and authority to secure the services of advisors both inside and outside the Company and has budgetary authority to secure such services. In the past, the Committee has used information from third-party surveys, input from senior management, and their own knowledge and experiences in compensation matters. The Compensation Committee to date has not retained the services of any outside compensation consultant. The Committee believes that the research provided by the Company's management and information available from third party sources, whether for free or for commercial purchase, has provided sufficient benchmarking data to date.

In 2006, at the Committee's request, the Company's senior management compiled compensation information from annual reports and proxy materials of other companies and from business and industry publications and provided a report to the Committee on such data. Companies reviewed for this purpose include, but are not necessarily limited to, other radio broadcasting companies. In 2006, the Committee purchased no third party survey or other compensation information.

The Compensation Committee arranges its meetings primarily around the Company's annual compensation review process. Typically, the Committee discusses general parameters of base pay, annual incentive compensation and equity-based compensation at its October meeting, finalizes equity-based pay in its December meeting, and finalizes annual base pay and annual incentives in its January meeting. Other meetings held during the year focus on discussion of strategic initiatives, approval of equity grants and evaluation of current compensation practices.

Role of Executives in Establishing Compensation

As indicated above, the Compensation Committee annually seeks input from the Company's Chief Executive Officer, Mr. William Stakelin, and the Company's Chief Financial Officer, Mr. Anthony Vasconcellos, in the compensation setting process. The Committee requests that senior management assist with preparation of the Committee's meeting agendas and assemble pertinent compensation background information that aids the Committee in its determination of annual compensation decisions. When requested by the Committee, the Chief Executive Officer and Chief Financial Officer also participate in Committee meetings and provide management's perspective on items being discussed. The Committee asks Messrs. Stakelin and Vasconcellos for their input on increases relating to base pay, annual incentive payouts and stock awards. Specifically, for the determination of base pay increases, the Compensation Committee asks Messrs. Stakelin and Vasconcellos to discuss the budgeted average annual salary increases for all Regent employees, which information is used by the Committee as a comparison point in determining salary increases for Messrs. Stakelin and Vasconcellos.

For annual bonus and incentive compensation determinations, Mr. Stakelin provides the Committee with a written report on the achievements of senior management, including Mr. Vasconcellos, and shares his recommendation on the determination of annual bonus and incentive payouts. Mr. Vasconcellos provides the Committee with the Company's financial performance, particularly station operating income which is the sole determinant for one-half of the potential annual incentive payout to Messrs. Stakelin and Vasconcellos. For the determination of annual equity awards, Mr. Vasconcellos provides the Committee with a chart showing management's recommendations for all key management

8

Table of Contents

employees who receive stock grants. This chart includes the proposed grants for Messrs. Stakelin and Vasconcellos. The Committee reviews this information and also typically asks for input from Ms. Ginger Scherbarth, the Company's director of human resources, Corporate Secretary and secretary for the Compensation and Nominating and Corporate Governance Committees of the Board.

Although the Company's management plays an important role in assisting the Compensation Committee, the Compensation Committee has full authority to make all decisions regarding compensation for the Company's executive officers and to determine senior management base pay, annual incentive compensation and incentive awards. After receiving input from the Company's management, the Compensation Committee then exercises its sole discretion in making the final compensation decisions. When making those final decisions, the Committee meets in executive session without any members of management present.

## Compensation Committee Activity

Beginning in 2006, the Compensation Committee began granting executive officers and key employees annual awards of nonvested stock after completing an analysis of the nature of equity incentive awards that would best achieve the Company's compensation goals. Prior to 2006, the Compensation Committee generally made annual awards of stock options to the Company's executive officers and other key employees as a means to encourage these employees to remain employed by the Company and contribute to the Company's overall performance and, thus, the performance of the Company's common stock in the public market. The Compensation Committee designated the first Friday in January as the standard grant date for stock options to executives and key employees, with the fair market value of a share of Regent common stock on that date established as the grant price. During the period that the Compensation Committee granted stock options to executives and key employees, there was no program, plan or practice to time option grants in coordination with the release of material non-public information, nor was there any plan by the Company to time its release of material non-public information for the purpose of affecting the value of executive compensation.

In 2006, the Compensation Committee decided to change the nature of the Company's incentive equity awards by ceasing to make future grants of stock options and began to make awards of nonvested stock. The Compensation Committee believed that this change in practice would better serve the interests of the Company and its stockholders for several reasons. The Committee perceived that the Company's outstanding stock options to executive officers and other key employees were not having the intended incentive effect as the Company's stock price has declined in recent years, notwithstanding the Company's strong financial performance compared to other radio broadcasting companies. Nonvested stock, on the other hand, provides direct value to the Company's executive officers and key employees and more directly aligns their interests with the Company's other stockholders as changes in stock price impact the value of such nonvested shares as compared to stock options that have little or no perceived value if the option exercise price is less than the current market value of the stock. The Committee also considered the potential effect of changes in accounting rules requiring the expensing of stock options and the fact that many other public companies were moving from stock option grants to awards of nonvested stock as a better compensation practice. The Committee did not consider the new grants of nonvested stock to replace any of the existing stock options held by the executive officers, which grants remain outstanding but which have an exercise price above the current fair market value of the Company's common stock.

In 2007, the Compensation Committee has continued to review its philosophies and objectives in compensating the Company's executive officers. These initiatives include refining a process to more narrowly define the measurement criteria that best determines the Company's success, such as considering whether a portion of the annual incentive compensation should include objective and subjective measures in the areas of increases in operating margin, deal making and overall management of the organization.

9

Table of Contents

In addition, the Committee is considering adopting a "claw back" policy that would require executives and other key employees to return to the Company certain incentive compensation in the event of accounting restatements. Such a policy would require the recalculation of annual bonus and incentive payouts if calculated and paid based upon faulty financial information.

## Objectives of the Executive Compensation Program

The purpose of the Company's executive compensation program is to influence the behavior of senior management to achieve objectives that are aligned with both the short-term and long-term interests of stockholders. Specifically, the principles underlying the program include:

- Offering competitive salaries to attract and retain highly-qualified and experienced executives;

- Providing incentive compensation that is tied to the performance of the Company and the individual executive; and

- Ensuring that the financial interests of the executives are aligned with those of the stockholders through equity-based awards.

The executive compensation program is designed to reward achievement in the following ways: important day-to-day operational activities are rewarded through base pay; annual business objectives are rewarded through annual incentive compensation; and long-term strategic initiatives are rewarded through nonvested stock awards. The Committee seeks to balance cash compensation with long-term equity incentives, such as shares of nonvested stock.

The Compensation Committee periodically evaluates its objectives and considers whether the compensation package for the Company's executive officers is adequately fulfilling the Committee's compensation objectives. For 2006, the Committee determined that the executive officer compensation package met the Committee's objectives.

## Program Elements

The Committee seeks to accomplish its compensation objectives through a mix of base salary, annual incentive compensation and long-term equity awards.

The Company has employment agreements with William L. Stakelin and Anthony A. Vasconcellos, which outline the parameters for their compensation packages. Mr. Stakelin is employed as Regent's President and Chief Executive Officer and Mr. Vasconcellos is employed as Regent's Executive Vice President and Chief Financial Officer. Mr. Stakelin's employment agreement further provides that he will serve on the Company's Board of Directors during his employment term. Each of these employment agreements has a three-year term commencing January 1, 2006 and ending December 31, 2008.

*Base Salary*. It is the Compensation Committee's policy to establish base salaries for the Company's executive officers at levels that the Committee believes are fair and competitive with those of executives with similar responsibilities at companies that the Committee considers comparable to the Company. The Compensation Committee reviews such information as may be acquired from annual reports and proxy materials of such other companies, business and industry publications and other sources as may be available from time to time. Such companies include, but are not limited to, other radio broadcasting companies. The Committee's primary objective is to set executive salaries at levels the Committee believes are appropriate for the duties and scope of responsibilities of each executive officer's position.

10

Table of Contents

Under Mr. Stakelin's employment agreement, Mr. Stakelin was entitled to a 2006 base salary of $330,171, plus an amount at least equal to the percentage increase in the Consumer Price Index (CPI) – All Items during the period of January 1, 2005 – December 31, 2005. The CPI increase for the 2005 year was 3.4% and Mr. Stakelin's base salary for 2006 was increased to $341,397. Mr. Vasconcellos' employment agreement similarly entitled him to a 2006 base salary of $250,000, plus an amount at least equal to the 2005 CPI increase of 3.4%. Accordingly, Mr. Vasconcellos' 2006 base salary was increased to $258,500. The Committee did not believe that any additional subjective adjustments to 2006 base salaries were necessary for Messrs. Stakelin and Vasconcellos in that these executive officers were also being granted potentially substantial annual incentive compensation for 2006.

For 2007, the Committee again reviewed the base salaries for Messrs. Stakelin and Vasconcellos which, pursuant to the terms of their employment agreements, were subject to upward adjustment in an amount at least equal to the 2006 CPI increase, which was 2.5%. The Committee also considered that the average 2007 budgeted salary increase for all Regent employees was projected to be in the 3.0 to 3.5% range and determined that the increases for Messrs. Stakelin and Vasconcellos should be consistent with those increases. Accordingly, for 2007, the base salaries for Messrs. Stakelin and Vasconcellos were increased by 3% to $351,639 and $266,255, respectively.

*Annual Incentive Compensation.* The Regent Communications, Inc. Senior Management Bonus Plan provides the Compensation Committee with a vehicle to award annual incentive compensation. As in recent years, the Compensation Committee established the target amount of the 2006 awards under this plan at 80% of the executive officer's 2006 base salary. The target incentive compensation for 2006 was based on the Company's financial performance and on subjective measures of individual achievement. Fifty percent (50%) of the annual incentive compensation target was based on the Company achieving certain levels of station operating income. The actual amount that the executive officers could earn under this measure is determined based on a straight sliding scale from 0% payout at 90% attainment of the station operating income target to a full payout upon attaining 100% of the target station operating income. The Compensation Committee retains discretion to award a larger bonus if the Company exceeds the financial performance goals. The remaining fifty percent (50%) of annual incentive compensation is determined by subjective measures in the discretion of the Committee, such as the ability and performance of the executive officer in leading the Company through key initiatives. The Compensation Committee also has the discretion to determine whether the incentive compensation is awarded in all cash, all equity or any combination of cash and equity.

For 2006, the annual incentive compensation paid in 2007 to each of Mr. Stakelin and Mr. Vasconcellos totaled 80% of the target amount (64% of each executive officer's 2006 base salary). This payout was based on the Company achieving 96% of its station operating income target, thereby earning the executive officers 60% of the total potential amount that they could have received on that component of incentive compensation, i.e., 24% of their respective base salaries. Each of the executive officers received a 100% payout on the individual achievement component, as determined in the discretion of the Compensation Committee, i.e., 40% of their respective base salaries. The aggregate incentive compensation amounts paid to Mr. Stakelin and Mr. Vasconcellos for 2006 was $218,494 and $165,440, respectively, all of which was paid in cash. The Committee determined that with a substantial portion of the 2006 compensation package already including a substantial number of shares of nonvested stock, a cash payout of annual incentive compensation would best meet the Committee's compensation objectives.

Essentially the same bonus plan as implemented for 2006 will be in place for 2007, which targets a payout of 80% of base salary. Fifty percent (50%) of the annual incentive target will be based on the Company achieving certain levels of station operating income. The other fifty percent (50%) of annual incentive compensation will be determined by subjective criteria that the Committee is currently developing.

*Equity Awards.* To enable the Company's executive officers and other members of senior management to own a stake in the Company, as an incentive focused on alignment with stockholder

11

Table of Contents

interests, the Compensation Committee has the ability under the Company's 2005 Incentive Compensation Plan to award grants of nonvested stock, incentive and non-qualified stock options and/or other equity-based incentives described in the plan. In making awards, the Committee considers individual factors and reviews the practices of comparable companies in making such awards in the context of the total compensation of the executive officer.

As discussed above, in 2006 the Committee decided to move toward the granting of nonvested stock in lieu of future awards of stock options. The determination of the 2006 award amounts was made so as to set long term compensation sufficient to retain key employees in the Committee's determination. The Committee's current practice is to grant equity awards to the executive officers and senior management on the first business day of the Company's fiscal year. For each of 2006 and 2007, Mr. Stakelin was awarded 75,000 shares of nonvested stock and Mr. Vasconcellos was awarded 50,000 shares of nonvested stock. The Committee believes that the amount of these awards is appropriate given the responsibilities and performance of Messrs. Stakelin and Vasconcellos, and that the awards will have the effect of further incentivizing their performance.

## Other Benefits

In conjunction with benefits that are offered to all full-time Regent employees, Messrs. Stakelin and Vasconcellos are offered Company benefits including medical, dental and life insurance, long-term disability coverage, and participation in the Company's 401(k) Profit Sharing Plan, which plan includes a Company matching contribution made in Regent common stock.

Messrs. Stakelin and Vasconcellos and other members of senior management also have the ability to participate in Regent's Non-Qualified Deferred Compensation Plan, which plan also includes a matching contribution by the Company. The employment agreements for Messrs. Stakelin and Vasconcellos also provide that the Company will pay the employee portion of their health insurance premiums and will provide an auto allowance, parking and automobile insurance.

## Elements of Post-Termination Compensation

Messrs. Stakelin and Vasconcellos may terminate their respective employment agreements for any reason upon 90 days notice and the Company may terminate the agreements at any time. In the event of a termination by reason of death or disability, in the event of a termination by the Company without cause or upon expiration of the employment period, then (a) Regent may, at its election, purchase: (i) all shares of Regent stock beneficially owned by the executive at a price equal to its fair market value as of the date of termination and (ii) all vested stock options held by him at a price equal to the excess of the fair market value of the underlying stock over the exercise price, or, if there is no such excess, then for $100; (b) all unvested options will terminate; and (c) the executive is entitled to receive his base salary through the termination date and, in the event of disability, for up to one year after termination during the continuation of disability. In the case of termination due to death or disability, the executive is also entitled to a prorated portion of any bonus to which he otherwise would have been entitled. If employment is terminated by Regent without cause, the employment agreements entitle Messrs. Stakelin or Vasconcellos, as the case may be, to receive, in addition to base salary and bonus prorated through the date of termination, the greater of his current base salary for an additional 12-month period or his current base salary throughout the remaining portion of the current three-year term of the employment agreement.

In the event of a termination by either the Company or the executive within 24 months following a change of control of the Company, the executive is entitled to receive all accrued and unpaid compensation earned prior to termination plus an amount equal to 2.99 times the executive's current base salary, which base salary shall be calculated on an amount no less than the executive's base salary prior to the change of control. For purposes of the employment agreements, a "change of control" shall be deemed to have occurred upon the acquisition by any person or group of persons of 30% or more of the

12

Table of Contents

Company's voting power; upon the existing stockholders of the Company having less than 50% of the voting power of the resulting entity following a reorganization, merger or consolidation; or upon the liquidation, dissolution or sale of all or substantially all of the Company's assets.

Messrs. Stakelin and Vasconcellos are subject to customary non-competition and non-solicitation covenants during their period of employment with Regent and for an 18-month period thereafter (12 months in the case of a termination of employment by Regent without cause where severance is being paid) as well as customary confidentiality covenants.

## Regulatory Considerations

*Section 162(m)*. Based on the Compensation Committee's past compensation practices, the Committee does not currently believe that Section 162(m) of the Internal Revenue Code, which limits the deductibility of executive compensation in certain events, will adversely affect the Company's ability to obtain a tax deduction for compensation paid to its executive officers.

*Nonqualified Deferred Compensation*. The American Jobs Creation Act of 2004, which was signed into law on October 22, 2004, modified tax rules applicable to nonqualified deferred compensation arrangements and, in certain circumstances, may apply to equity awards, severance payments and other forms of compensation that may constitute deferred compensation for purposes of Section 409A. While the final regulations under Section 409A of the Internal Revenue Code have not yet become effective, the Company believes it is operating in good faith compliance with the statutory provisions, which became effective January 1, 2005.

## Compensation Committee Report

The Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis included herein with management, as well as the accompanying tables set forth below. Based on this review and discussion, the Compensation Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Proxy Statement and incorporated into the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

2006 Compensation Committee Members:                        John H. Wyant, Chairman
William P. Sutter, Jr.
Andrew L. Lewis, IV

13

Table of Contents

## EXECUTIVE COMPENSATION

The following table is a summary of certain information concerning the compensation awarded or paid to, or earned by, the Company's Chief Executive Officer, William L. Stakelin, and Chief Financial Officer, Anthony A. Vasconcellos, (the "Named Executives") during the last fiscal year.

### Summary Compensation Table For 2006

| Name and Principal Position | Year | Salary ($) | Bonus[1] ($) | Stock Awards[3] ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation[1] ($) | Change in Pension Value and Nonqualified Deferred Compensation ($) | All Other Compensation[2] ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| William L. Stakelin, President and Chief Executive Officer | 2006 | $341,397 | $136,559 | $88,875 | $0 | $81,935 | $ 0 | $20,010 | $668, |
| Anthony A. Vasconcellos, Executive Vice President and Chief Financial Officer | 2006 | $258,500 | $103,400 | $59,250 | $0 | $62,040 | $ 0 | $15,281 | $498, |

[1] The Company's Senior Management Bonus Plan provides for potential compensation to each Named Executive of up to 80% of his annual base salary. One-half of the potential compensation (40% of the Named Executive's base salary) is based upon the executive's personal performance for the fiscal year and has been included in the bonus column. For the 2006 fiscal year, each Named Executive was awarded 100% of the personal performance component under the Senior Management Bonus Plan. The remaining one-half of potential compensation (40% of the Named Executive's base salary) is awarded based upon the Company's financial performance for the fiscal year. For the 2006 fiscal year, each Named Executive was awarded 60% of his total potential compensation under the financial component of the Senior Management Bonus Plan, which amounted for each Named Executive to 24% of his base salary.

[2] All Other Compensation consists of auto allowances, employer match under the Company's 401(k) Profit Sharing and Deferred Compensation Plans, and employer-paid premiums for medical and dental insurance.

[3] On January 3, 2006, Messrs. Stakelin and Vasconcellos were awarded 75,000 and 50,000 shares of nonvested Regent common stock, respectively. The nonvested shares vest in four equal annual installments, commencing on January 3, 2007. The amounts included under the Stock Awards column above represent the portion of nonvested shares that will vest on January 3, 2007, multiplied by the grant date fair market value of $4.74 per share.

14

Table of Contents

### Grants Of Plan-Based Awards For 2006

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units[3] (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exe or Pri Op Aw ( |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target[1] ($) | Maximum[2] ($) | Threshold (#) | Target (#) | Maximum (#) | | | |
| **William L. Stakelin** | | | | | | | | | | |
| Nonvested stock award | 1/03/2006 | | | | | | | 75,000 | 0 | $ |
| Non-equity incentive plan | | $1,366 | $136,559 | $136,559 | 0 | 0 | 0 | | | |
| **Anthony A. Vasconcellos** | | | | | | | | | | |
| Nonvested stock award | 1/03/2006 | | | | | | | 50,000 | 0 | $ |
| Non-equity incentive plan | | $1,034 | $103,400 | $103,400 | 0 | 0 | 0 | | | |

[1] The actual amounts paid for 2006 performance under the Non-Equity Incentive Plan Awards were those amounts included under such caption in the Summary Compensation Table For 2006.

[2] The Compensation Committee has discretion to increase the maximum amount paid under the plan in the event the Company exceeds the targeted amount.

[3] The nonvested shares vest in four equal annual installments commencing one year from January 3, 2006, the date of grant.

There were no re-pricings or material modifications of any outstanding option or other stock-based award during 2006.

15

Table of Contents

## Outstanding Equity Awards At 2006 Fiscal Year-End

The following table outlines equity-based compensation awards for the Named Executives as of December 31, 2006. Each outstanding award is shown separately. Option Awards include both non-qualified and incentive stock options. Stock Awards include nonvested share awards.

| Name | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options # Exercisable | Number of Securities Underlying Unexercised Options # Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| **William L. Stakelin** | | | | | | | | | |
| | 608,244 | 0 | 0 | $5.00 | 6/15/2008 | | | | |
| | 125,089 | 0 | 0 | $5.00 | 4/29/2009 | | | | |
| | 100,000 | 0 | 0 | $7.76 | 5/17/2011 | | | | |
| | 100,000 | 0 | 0 | $6.93 | 1/4/2012 | | | | |
| | 100,000 | 0 | 0 | $5.86 | 1/3/2013 | | | | |
| | 100,000 | 0 | 0 | $6.46 | 1/2/2014 | | | | |
| | 125,000 | 0 | 0 | $5.33 | 1/7/2015 | | | | |
| | | | | | | 75,000[1] | 212,250[2] | | |
| **Anthony A. Vasconcellos** | | | | | | | | | |
| | 25,000 | 0 | 0 | $5.00 | 11/6/2008 | | | | |
| | 25,000 | 0 | 0 | $5.50 | 10/28/2009 | | | | |
| | 100,000 | 0 | 0 | $7.76 | 5/17/2011 | | | | |
| | 75,000 | 0 | 0 | $6.93 | 1/4/2012 | | | | |
| | 75,000 | 0 | 0 | $5.86 | 1/3/2013 | | | | |
| | 75,000 | 0 | 0 | $6.46 | 1/2/2014 | | | | |
| | 75,000 | 0 | 0 | $5.33 | 1/7/2015 | | | | |
| | | | | | | 50,000[3] | 141,500[4] | | |

---

[1] The nonvested shares awarded to the above Named Executive on January 3, 2006, vest in four equal annual installments of 18,750 shares through 2010.

[2] The value of nonvested shares awarded to the above Named Executive was calculated using a price of $2.83, the closing price of a share of Regent Communications, Inc. common stock on the last business day of the preceding calendar year.

[3] The nonvested shares awarded to the above Named Executive on January 3, 2006, vest in four equal annual installments of 12,500 shares through 2010.

[4] The value of nonvested shares awarded to the above Named Executive was calculated using a price of $2.83, the closing price of a share of Regent Communications, Inc. common stock on the last business day of the preceding calendar year.

16

Table of Contents

## Option Exercises And Stock Vested For 2006

| | Option Awards | | Stock Awards | |
| Name | Number of Shares Acquired on Exercise # | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
|---|---|---|---|---|
| William L. Stakelin | 0 | $ 0 | 0 | $ 0 |
| Anthony A. Vasconcellos | 0 | $ 0 | 0 | $ 0 |

There were no stock options exercised in 2006. Additionally, none of the nonvested shares of Regent common stock awarded to the above Named Executives under The Regent Communications, Inc. 2005 Incentive Compensation Plan vested in 2006.

## Pension Benefits For 2006

The Company does not offer a defined benefit pension plan. Employer match for the Company's 401(k) Profit Sharing Plan is included in other compensation in the Summary Compensation Table.

## Nonqualified Deferred Compensation For 2006

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY ($) | Aggregate Earnings (loss) in Last FY ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE ($) |
|---|---|---|---|---|---|
| William L. Stakelin | $46,578 | $4,693 | $9,965 | $ 0 | $215,908 |
| Anthony A. Vasconcellos | $ 4,662 | $3,537 | $ (144) | $ 0 | $ 40,135 |

Under the provisions of The Regent Communications, Inc. Deferred Compensation Plan, participants may elect to have a specified dollar amount or a whole percentage of his compensation deferred and credited to his deferred compensation account. Participants may also elect to defer a portion of any regular or annual bonus that is part of his compensation earned in any plan year. Earnings on participant contributions are based upon the investment elections selected by each participant of the mutual fund options contained within the plan. The Company matches participant contributions at a rate determined by the Board of Directors each year. For the 2006 year, the Board set the company match at 100% of the first 1% of the participant's earnings deferred into the plan. The Company match is made in phantom units of Regent common stock, which are marked-to-market on a quarterly basis. A participant's vested balance is distributable upon termination of employment, retirement, death or disability. Payments made to the participant for their vested plan balance are made in a single lump sum cash payment.

17

Table of Contents

**Potential Payments Upon Termination or Change in Control**

The Company has employment agreements with William L. Stakelin and Anthony A. Vasconcellos. Mr. Stakelin is employed as Regent's President and Chief Executive Officer and Mr. Vasconcellos is employed as Regent's Executive Vice President and Chief Financial Officer. The employment agreement for Mr. Stakelin also requires the Company to seek to cause him to be nominated to serve on the Company's Board of Directors. Each employment agreement is for a three-year term commencing January 1, 2006 and ending December 31, 2008.

Under their employment agreements, beginning January 1, 2006, Mr. Stakelin is entitled to a base salary of no less than $341,397 and Mr. Vasconcellos is entitled to a base salary of no less than $258,500. The base salary amounts are subject each 12-month period to an increase in the discretion of the Board of Directors and to a mandatory cost-of-living increase tied to the Consumer Price Index-All Items. The employment agreements also provide for Messrs. Stakelin and Vasconcellos to receive discretionary annual bonuses in accordance with the Company's Senior Management Bonus Plan. These bonuses, if any, will be determined by the Compensation Committee of the Board of Directors of Regent and are based on performance of the executive and Regent and the achievement of certain goals established for each year. In addition, the employment agreements entitle Messrs. Stakelin and Vasconcellos each to receive, at the discretion of the Compensation Committee of the Board of Directors, annual grants of nonvested stock, stock options or other equity-based incentives, and/or incentive and non-qualified options to purchase common stock of the Company and other equity-based incentives pursuant to any incentive compensation plans as may be adopted by the Company from time to time. Pursuant to the employment agreements, Messrs. Stakelin and Vasconcellos also receive an automobile allowance, parking and automobile insurance coverage at Regent's expense and other benefits available to key management employees, including the employee portion of health insurance premiums.

Messrs. Stakelin and Vasconcellos may terminate their respective agreements for any reason upon 90 days notice and the Company may terminate the agreements at any time. In the event of a termination by reason of death or disability, in the event of a termination by the Company without cause or upon expiration of the employment period, then (a) Regent may, at its election, purchase: (i) all shares of Regent stock beneficially owned by the executive at a price equal to its fair market value as of the date of termination and (ii) all vested stock options held by him at a price equal to the excess of the fair market value of the underlying stock over the exercise price, or, if there is no such excess, then for $100; (b) all unvested options will terminate; and (c) the executive is entitled to receive his base salary through the termination date and, in the event of disability, for up to one year after termination during the continuation of disability. In the case of termination due to death or disability, the executive is also entitled to a prorated portion of any bonus to which he otherwise would have been entitled. If employment is terminated by Regent without cause, the employment agreements entitle Messrs. Stakelin or Vasconcellos, as the case may be, to receive, in addition to base salary and bonus prorated through the date of termination, the greater of his current base salary for an additional 12-month period or his current base salary throughout the remaining portion of the current three-year term of the employment agreement. In the event of a termination by either the Company or the executive within 24 months following a change of control of the Company, the executive is entitled to receive all accrued and unpaid compensation earned prior to termination plus an amount equal to 2.99 times the executive's current base salary, which base salary shall be calculated on an amount no less than the executive's base salary prior to the change of control. For purposes of the employment agreements, a "change of control" shall be deemed to have occurred upon the acquisition by any person or group of persons of 30% or more of the Company's voting power; upon the existing stockholders of the Company having less than 50% of the voting power of the resulting entity following a reorganization, merger or consolidation; or upon the liquidation, dissolution or sale of all or substantially all of the Company's assets.

18

Table of Contents

As a condition to each Named Executive's employment agreement, the Named Executive is bound by the terms of a non-competition agreement which prohibits the executive from working in the Radio Business within a twenty-five mile radius of any radio station transmission tower or studio then owned or operated, directly or indirectly, by the Company for an eighteen-month period. Additionally, the executive is bound by a non-solicitation agreement within a twenty-five mile radius of any radio station transmission tower or studio then owned or operated, directly or indirectly, by the Company for an eighteen-month period.

The following table describes the potential payments upon termination or a change in control of the Company for William L. Stakelin, the Company's President and Chief Executive Officer.

| Executive Benefits and Payments Upon Termination | Voluntary Termination | For Cause Termination | Involuntary Not for Cause Termination[1] | Disability | Expiration of Employment Agreement | Death | Change in Control |
|---|---|---|---|---|---|---|---|
| Repurchase of owned Company common stock [2] | $0 | $0 | $ 548,755 | $ 548,755 | $548,755 | $548,755 | $ 0 |
| Repurchase of fair market value of vested stock options [3] | $0 | $0 | $ 100 | $ 100 | $ 100 | $ 100 | $ 0 |
| Base salary [4] | $0 | $0 | $ 682,794 | $ 341,397 | $ 0 | $ 0 | $1,020,777 |
| Senior Management Bonus Plan | $0 | $0 | $ 218,494 | $ 218,494 | $218,494 | $218,494 | $ 218,494 |
| Life insurance, medical, dental and hospitalization [5] | $0 | $0 | $ 13,744 | $ 13,744 | $ 13,744 | $ 13,744 | $ 13,744 |
| Nonvested stock, unvested and accelerated [6] | $0 | $0 | $ 0 | $ 212,250 | $ 0 | $212,250 | $ 212,250 |
| Total | $0 | $0 | $1,463,887 | $1,334,740 | $781,093 | $993,343 | $1,465,265 |

[1] Assumes the Named Executive's benefit under an involuntary not for cause termination is equal to the remaining amount of base salary through December 31, 2008, the expiration of the Named Executive's employment agreement, the actual annual bonus earned under the Senior Management Bonus Plan for the 2006 fiscal year, perquisites, the repurchase by the Company of the executive's owned shares of Regent common stock, and the repurchase by the Company of the Named Executive's vested, non-exercised stock options.

[2] The Company may, at its election, repurchase all owned shares of Regent common stock from the Named Executive, payable in three annual installments. Assumes the Named Executive's date of termination is December 31, 2006, and a fair market value of $2.91 per share, calculated by taking the average of the high and low price of a share of Regent common stock as reported on the Nasdaq Global Market on the last business day of the fiscal year.

[3] The Company may, at its election, repurchase all vested unexercised stock options from the Named Executive, payable in three annual installments. Assumes the Named Executive's date of termination is December 31, 2006. The repurchase price for each vested unexercised stock option is the excess of the fair market value, calculated by taking the average of the high and low price of a share of Regent common stock as reported on the Nasdaq Global Market on the last business day of the year, of the

Table of Contents

shares subject to all vested options over the exercise price of the options, if any. If there is no excess value, the options will be repurchased in the aggregate for $100.

(4)  For analysis purposes, the Named Executive's base salary was equal to the salary in place for the 2006 fiscal year.

(5)  The Named Executive is entitled to Company-paid life insurance, medical, dental and hospitalization premiums for the lesser of 12 months or the number of months until the executive attains the age of 65. For purposes of the calculation, the Company used the total cost of premiums paid for such plans as of December 31, 2006.

(6)  Under the terms of The Regent Communications, Inc. 2005 Incentive Compensation Plan, any unvested shares of nonvested stock will automatically accelerate to 100% vested in the instances of an employee's death, permanent disability, or a change in control of the Company.

The following table describes the potential payments upon termination or a change in control of the Company for Anthony A. Vasconcellos, the Company's Executive Vice President and Chief Financial Officer.

| Executive Benefits and Payments Upon Termination | Voluntary Termination | For Cause Termination | Involuntary Not for Cause Termination[1] | Disability | Expiration of Employment Agreement | Death | Change in Control |
|---|---|---|---|---|---|---|---|
| Repurchase of owned Company common stock [2] | $0 | $0 | $ 87,237 | $ 87,237 | $ 87,237 | $ 87,237 | $ 0 |
| Repurchase of fair market value of vested stock options [3] | $0 | $0 | $ 100 | $ 100 | $ 100 | $ 100 | $ 0 |
| Base salary [4] | $0 | $0 | $517,000 | $258,500 | $ 0 | $ 0 | $ 772,915 |
| Senior Management Bonus Plan | $0 | $0 | $165,440 | $165,440 | $165,440 | $165,440 | $ 165,440 |
| Life insurance, medical, dental and hospitalization [5] | $0 | $0 | $ 15,065 | $ 15,065 | $ 15,065 | $ 15,065 | $ 15,065 |
| Nonvested stock, unvested and accelerated [6] | $0 | $0 | $ 0 | $141,500 | $ 0 | $141,500 | $ 141,500 |
| Total | $0 | $0 | $784,842 | $667,842 | $267,842 | $409,342 | $1,094,920 |

(1)  Assumes the Named Executive's benefit under an involuntary not for cause termination is equal to the remaining amount of base salary through December 31, 2008, the expiration of the Named Executive's employment agreement, the actual annual bonus earned under the Senior Management Bonus Plan for the 2006 fiscal year, perquisites, the repurchase by the Company of the Named Executive's owned shares of Regent common stock, and the repurchase by the Company of the executive's vested, non-exercised stock options.

(2)  The Company may, at its election, repurchase all owned shares of Regent common stock from the Named Executive, payable in three annual installments. Assumes the Named Executive's date of termination is December 31, 2006, and a fair market value of $2.91 per share, calculated by taking the average of the high and low price of a share of Regent common stock as reported on the Nasdaq Global Market on the last business day of the fiscal year.

20

**Table of Contents**

(3) The Company may, at its election, repurchase all vested unexercised stock options from the Named Executive, payable in three annual installments. Assumes the Named Executive's date of termination is December 31, 2006. The repurchase price for each vested unexercised stock option is the excess of the fair market value, calculated by taking the average of the high and low price of a share of Regent common stock as reported on the Nasdaq Global Market on the last business day of the year, of the shares subject to all vested options over the exercise price of the options, if any. If there is no excess value, the options will be repurchased in the aggregate for $100.

(4) For analysis purposes, the Named Executive's base salary was equal to the salary in place for the 2006 fiscal year.

(5) The Named Executive is entitled to Company-paid life insurance, medical, dental and hospitalization premiums for the lesser of 12 months or the number of months until the executive attains the age of 65. For purposes of the calculation, the Company used the total cost of premiums paid for such plans as of December 31, 2006.

(6) Under the terms of The Regent Communications, Inc. 2005 Incentive Compensation Plan, any unvested shares of nonvested stock will automatically accelerate to 100% vested in the instances of an employee's death, permanent disability, or a change in control of the Company.

## COMPENSATION OF NON-EMPLOYEE DIRECTORS

### Compensation of Directors

Only non-employee directors of the Company are eligible to receive directors' fees. Non-employee directors receive the following compensation:

- A $1,000 monthly retainer;

- A Board Committee meeting fee of $2,000 for each on-site Board Committee meeting attended ($1,000 for attendance by telephone);

- A Board Committee meeting fee of $1,000 for each telephonic Board Committee meeting attended;

- The Chairman of the Board and Chair of each Board Committee receives the following fees:

  - Chairman of the Board – annual fee of $15,000

  - Audit Committee Chair – annual fee of $10,000

  - Nominating and Corporate Governance Committee Chair – annual fee of $5,000

  - Compensation Committee Chair – annual fee of $5,000

Each non-employee director of the Company is eligible to receive awards of stock appreciation rights, nonvested stock, or non-qualified stock options under the Regent Communications, Inc. 2006 Directors Equity Compensation Plan. The terms, conditions, form and amount of such awards, if any, are determined by the Compensation Committee of the Company's Board of Directors. Each director serving on the Company's Board of Directors on May 10, 2006, was awarded 5,000 nonvested shares of Regent common stock.

21

Table of Contents

The following table presents the compensation provided by the Company to the non-employee directors for the year ended December 31, 2006.

# EXHIBIT C



# FORM SC 13D/A

## REGENT COMMUNICATIONS INC - RGCI

**Filed: June 29, 2007 (period: )**

An amendment to a SC 13D filing



SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 13D
(Rule 13d-2-101)

INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT TO RULE 13d-1(a) AND
AMENDMENTS THERETO FILED PURSUANT TO RULE 13d-2(a)

(Amendment No. 1)[1]

**Regent Communications, Inc.**
(Name of Issuer)

**Common Stock**
(Title of Class of Securities)

758865109
(CUSIP Number)

**Riley Investment Management LLC**
**Attn:  Bryant R. Riley**
**11100 Santa Monica Blvd.**
**Suite 810**
**Los Angeles, CA 90025**
**(310) 966-1445**
(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

**June 27, 2007**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(b)(3) or (4), check the following box: ☐

Note:  Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits.  See Rule 13d-7(b) for other parties to whom copies are to be sent.

(Continued on following pages)

---

1    The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. 758865109                      **13D**                                          Page 2

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Partners Master Fund, L.P. | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | (a) [ ]<br>(b) [X] | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>WC | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>[ ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Cayman Islands | | |

| NUMBER OF | 7 | SOLE VOTING POWER<br>2,562,843 |
|---|---|---|
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER<br>-0- |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER<br>2,562,843 |
| REPORTING | | |
| PERSON | 10 | SHARED DISPOSITIVE POWER<br>-0- |
| WITH | | |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,562,843 |
|---|---|
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*<br>[ ] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.6%[1] |
| 14 | TYPE OF REPORTING PERSON*<br><br>PN |

---

1    Based on 38,700,561 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at May 4, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed with the Securities and Exchange Commission on May 10, 2007.

---

Source: REGENT COMMUNICATION, SC 13D/A, June 29, 2007

**13D**

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Management LLC | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a)  [  ]<br>(b)  [X] |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>[  ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br><br>2,824,433[1] | |
| | 8 | SHARED VOTING POWER<br><br>397,024[2] | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,824,433[1] | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>397,024[2] | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,824,433[2] | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*<br>[X] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>7.3%[3] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>IA | | |

1    Because Riley Investment Management LLC has sole investment and voting power over 2,562,843 shares of Common Stock held by Riley Investment Partners Master Fund, L.P. and the 261,590 shares of Common Stock beneficially held by Mr. Riley in an investment advisory account managed by Riley Investment Management LLC, Riley Investment Management LLC may be deemed to have beneficial ownership of these shares.

2    Riley Investment Management LLC has shared voting and dispositive power over 397,024 shares of Common Stock held by its investment advisory clients.  However, Riley Investment Management LLC disclaims beneficial ownership of these shares.

Source: REGENT COMMUNICATION, SC 13D/A, June 29, 2007

**13D**

3    Based on 38,700,561 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at May 4, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed with the Securities and Exchange Commission on May 10, 2007.

Source: REGENT COMMUNICATION, SC 13D/A, June 29, 2007

**13D**

| | | |
|---|---|---|
| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Bryant R. Riley | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | (a)  [  ]<br>(b)  [X] |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS*<br>AF | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | [  ] |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States | |

| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br>2,824,433[1] |
|---|---|---|
| | 8 | SHARED VOTING POWER<br>397,024[2] |
| | 9 | SOLE DISPOSITIVE POWER<br>2,824,433[1] |
| | 10 | SHARED DISPOSITIVE POWER<br>397,024[2] |

| | | |
|---|---|---|
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,824,433[2] | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES* | [X] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>7.3%[3] | |
| 14 | TYPE OF REPORTING PERSON*<br><br>IN | |

1    Because Riley Investment Management LLC has sole voting and investment power over Riley Investment Partners Master Fund, L.P.'s security holdings, and Mr. Riley, in his role as the sole manager of Riley Investment Management LLC, controls its voting and investment decisions, each of Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC, and Mr. Riley may be deemed to have beneficial ownership of the 2,562,843 shares of Common Stock held by Riley Investment Partners Master Fund, L.P. Includes 261,590 shares of Common Stock beneficially held by Mr. Riley in an investment advisory account managed by Riley Investment Management LLC.

2    Riley Investment Management LLC has shared voting and dispositive power over 397,024 shares of Common Stock owned by its investment advisory clients. Although Mr. Riley controls Riley Investment Management LLC's voting and investment decisions for its investment advisory clients, Mr. Riley disclaims beneficial ownership of these shares.

3    Based on 38,700,561 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at May 4, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed with the Securities and Exchange Commission on May 10, 2007.

CUSIP No. 758865109

**13D**

**Item 5.**     **Interest in Securities of the Issuer**

Item 5(c) as previously filed is amended to add the following information:

(c)     The following are transactions effected by the other Reporting Persons in Common Stock that have taken place in the past 60 days.

| Master | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 5/7/2007 | BY | 18,920 | 3.33 |
| | 5/8/2007 | BY | 3,728 | 3.318 |
| | 5/18/2007 | BY | 35,416 | 3.32 |
| | 5/18/2007 | BY | 559 | 3.3 |
| | 5/22/2007 | BY | 3,752 | 3.3 |
| | 5/23/2007 | BY | 3,542 | 3.3 |
| | 5/25/2007 | BY | (90,649) | 3.32 |
| | 6/8/2007 | BY | 23,225 | 3.4 |
| | 6/28/2007 | BY | 37,160 | 3.2996 |

| Investment Advisory Clients | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 5/1/2007 | BY | 700 | 3.39 |
| | 5/2/2007 | BY | 4,689 | 3.39 |
| | 5/3/2007 | BY | 9,252 | 3.39 |
| | 5/4/2007 | BY | 5,359 | 3.39 |
| | 5/7/2007 | BY | 10,000 | 3.3696 |
| | 5/7/2007 | BY | 1,380 | 3.33 |
| | 5/8/2007 | BY | 272 | 3.318 |
| | 5/18/2007 | BY | 41 | 3.3 |
| | 5/18/2007 | BY | 2,584 | 3.32 |
| | 5/22/2007 | BY | 274 | 3.3 |
| | 5/23/2007 | BY | 258 | 3.3 |
| | 6/8/2007 | BY | 1,775 | 3.4 |
| | 6/28/2007 | BY | 2,840 | 3.2996 |

| Bryant Riley | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 5/25/2007 | BY | 90,649 | 3.32 |
| | 5/31/2007 | BY | 9,078 | 3.433 |
| | 6/19/2007 | BY | 5,078 | 3.3 |
| | 6/20/2007 | BY | 250 | 3.3 |
| | 6/22/2007 | BY | 300 | 3.3 |
| | 6/25/2007 | BY | 28,399 | 3.3 |
| | 6/26/2007 | BY | 1,400 | 3.3 |
| | 6/27/2007 | BY | 97,865 | 3.3 |
| | 6/29/2007 | BY | 28,571 | 3.3268 |

Source: REGENT COMMUNICATION, SC 13D/A, June 29, 2007

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: June 29, 2007

<div align="right">

Riley Investment Partners Master Fund, L.P.
    By: Riley Investment Management LLC, its General
        Partner
By:   /s/ Bryant R. Riley
       Bryant R. Riley, Managing Member


Riley Investment Management LLC

By:   /s/ Bryant R. Riley
       Bryant R. Riley, Managing Member

By:   /s/ Bryant R. Riley
       Bryant R. Riley

</div>

Created by 10K Wizard    www.10KWizard.com

# EXHIBIT D



# FORM SC 13D/A

## REGENT COMMUNICATIONS INC - RGCI

**Filed: July 20, 2007 (period: )**

An amendment to a SC 13D filing

**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**SCHEDULE 13D**
(Rule 13d-2-101)

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO RULE 13d-2(a)**

(Amendment No. 2)[1]

**Regent Communications, Inc.**
(Name of Issuer)

**Common Stock**
(Title of Class of Securities)

**758865109**
(CUSIP Number)

**Riley Investment Management LLC**
**Attn: Bryant R. Riley**
**11100 Santa Monica Blvd.**
**Suite 810**
**Los Angeles, CA 90025**
**(310) 966-1445**
(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

**July 19, 2007**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(b)(3) or (4), check the following box: ☐

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

(Continued on following pages)

---

[1]    The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Source: REGENT COMMUNICATION, SC 13D/A, July 20, 2007

**13D**

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Partners Master Fund, L.P. | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [  ]<br>(b) [X] |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>WC | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>[  ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Cayman Islands | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br><br>2,588,913 | |
| | 8 | SHARED VOTING POWER<br><br>-0- | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,588,913 | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>-0- | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,588,913 | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*<br>[  ] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.7%[1] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>PN | | |

---

[1]  Based on 38,700,561 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at May 4, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed with the Securities and Exchange Commission on May 10, 2007.

| 1 | NAME OF REPORTING PERSON S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Management LLC | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [  ]<br>(b) [X] |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) | | [  ] |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware | | |
| NUMBER OF<br><br>SHARES<br><br>BENEFICIALLY<br><br>OWNED BY<br><br>EACH<br><br>REPORTING<br><br>PERSON<br><br>WITH | 7 | SOLE VOTING POWER<br><br>2,588,913[1] | |
| | 8 | SHARED VOTING POWER<br><br>668,487[2] | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,588,913[1] | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>668,487[2] | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,853,242[2] | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES* | | [X] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>7.4%[3] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>IA | | |

1    Because Riley Investment Management LLC has sole investment and voting power over 2,588,913 shares of Common Stock held by Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC may be deemed to have beneficial ownership of these shares.

2    Riley Investment Management LLC has shared voting and dispositive power over 668,487 shares of Common Stock held by its investment advisory clients, 264,329 of which are held by an investment advisory client indirectly affiliated with Bryant Riley. However, Riley Investment Management LLC disclaims beneficial ownership of the non-affiliated shares.

3    Based on 38,700,561 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at May 4, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed with the Securities and Exchange Commission on May 10, 2007.

Source: REGENT COMMUNICATION, SC 13D/A, July 20, 2007

CUSIP No. 758865109                          **13D**                                      Page 4

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Bryant R. Riley | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | (a) [  ]<br>(b) [X] | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>[  ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>United States | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br><br>2,588,913[1] |
| | 8 | SHARED VOTING POWER<br><br>668,487[2] |
| | 9 | SOLE DISPOSITIVE POWER<br><br>2,588,913[1] |
| | 10 | SHARED DISPOSITIVE POWER<br><br>668,487[2] |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,853,242[2] | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*<br>[X] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>7.4%[3] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>IN | | |

1    Because Riley Investment Management LLC has sole voting and investment power over Riley Investment Partners Master Fund, L.P.'s security holdings, and Mr. Riley, in his role as the sole manager of Riley Investment Management LLC, controls its voting and investment decisions, each of Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC, and Mr. Riley may be deemed to have beneficial ownership of the 2,588,913 shares of Common Stock held by Riley Investment Partners Master Fund, L.P.

2    Riley Investment Management LLC has shared voting and dispositive power over 668,487 shares of Common Stock owned by its investment advisory clients, 264,329 of which are held by an investment advisory client indirectly affiliated with Bryant Riley. Although Mr. Riley controls Riley Investment Management LLC's voting and investment decisions for its investment advisory clients, Mr. Riley disclaims beneficial ownership of the non-affiliated shares.

3    Based on 38,700,561 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at May 4, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 filed with the Securities and Exchange Commission on May 10, 2007.

Source: REGENT COMMUNICATION, SC 13D/A, July 20, 2007

**Item 4.    Interest in Securities of the Issuer**

Item 4 as previously filed is amended to add the following information:

On July 19, 2007, RIP and investment advisory clients of RIM sent, or Cede & Co. on behalf of such persons sent on their behalf, letters to the Issuer calling for a special meeting of the Issuer's stockholders to: (1) to amend the Issuer's bylaws to fix the number of directors at nine, (2) to amend the Issuer's bylaws to allow stockholders to fill vacancies on the board created by increasing the size of the board or the removal of a director by the stockholders, (3) to elect John Ahn, Bob D'Agostino, Jared Davis and Joseph Patrick Hannan as directors of the Issuer to fill the vacancies on the board; and (4) to repeal any provisions or amendments to the Issuer's bylaws adopted after the last version filed with Securities and Exchange Commission. The foregoing description of the letter is qualified in its entirety by reference to the letter attached as Exhibit A. Certain other shareholders of the Issuer sent, or directed Cede & Co. to send, the same form of letter calling for a special meeting. Such shareholders (based on information they provided), RIP and investment advisory clients hold, in the aggregate, at least 20% of the outstanding Common Stock. The Reporting Persons expressly disclaim beneficial ownership of shares of the Common Stock held by these other shareholders and disclaim the formation of a group with these other shareholders. The other shareholders have not committed to, and were not asked, to vote at the special meeting. The Reporting Persons did not solicit, and did not obtain, proxies with respect to the shares held by such other shareholders.

Each of the nominees have agreed to be nominated to the board and to serve if elected. To the Reporting Persons' knowledge, Jared Davis and John Ahn beneficially own 376,065 and 13,000 shares of Common Stock, respectively. The Reporting Persons expressly disclaim beneficial ownership of shares of Common Stock held by the nominees.

On July 19, 2007, RIP also sent a letter to the Issuer requesting the ability to inspect its books and records to obtain a stockholder list and other related information for purposes of sending a notice and communicating with the Issuer's stockholders with respect the special meeting.

The taking of the actions proposed by the Reporting Persons at the special meeting of Issuer's stockholders described above would result in a change in the Issuer's present board of directors and management.

**13D**

**Item 5.**    **Interest in Securities of the Issuer**

See Item 4.

Item 5(c) as previously filed is amended to add the following information:

(c)    The following are transactions effected by the other Reporting Persons in Common Stock that have taken place in the past 60 days.

| Master | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 7/2/2007 | BY | 16,093 | 3.35 |
| | 7/3/2007 | BY | 9,977 | 3.35 |

| Investment Advisory Clients | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 7/2/2007 | BY | 1,691 | 3.35 |
| | 7/2/2007 | BY | 1,216 | 3.35 |
| | 7/3/2007 | BY | 754 | 3.35 |
| | 7/3/2007 | BY | 1,048 | 3.35 |
| | 7/19/2007 | BY | 5,164 | 3.3402 |

**Item 7.**    **Material to be filed as Exhibits**

Exhibit A    Letter, dated July 19, 2007, to the Issuer calling for a special meeting of stockholders.

**13D**

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: July 20, 2007

> Riley Investment Partners Master Fund, L.P.
>     By: Riley Investment Management LLC, its General
>     Partner
> By: /s/ Bryant R. Riley
> _____
>     Bryant R. Riley, Managing Member
>
>
> Riley Investment Management LLC
>
> By: /s/ Bryant R. Riley
> _____
>     Bryant R. Riley, Managing Member
>
>
> By: /s/ Bryant R. Riley
> _____
>     Bryant R. Riley

<div align="right">**EXHIBIT A**</div>

## DEMAND TO CALL A SPECIAL MEETING

<div align="center">
Riley Investment Partners Master Fund, L.P.<br>
c/o Riley Investment Management LLC<br>
11100 Santa Monica Blvd., Suite 800<br>
Los Angeles, CA 90025
</div>

July 19, 2007

VIA OVERNIGHT DELIVERY, REGISTERED MAIL AND FACSIMILE

Regent Communications, Inc.
2000 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
Attention: Secretary and President

Dear Sir or Madam:

Riley Investment Partners Master Fund, L.P. ("RIP") is a holder of record of 1,000 shares of common stock, $.01 par value per share ("Common Stock"), of Regent Communications, Inc. (the "Company"). A copy of RIP's stock certificate is attached. In addition, RIP is the beneficial holder of 2,587,913 shares of Common Stock.

As a holder of record, RIP hereby requests that you call a special meeting of the Shareholders of the Company (the "Special Meeting") to be held at 10:00 a.m., Cincinnati, Ohio time, on September 3, 2007 at The Cincinnatian Hotel, 601 Vine Street, Cincinnati, Ohio 45202 for the following purposes and to conduct the following business:

1.  To amend Section 1 of Article II of the Company's Amended and Restated By-laws, by replacing it in its entirety with the following:

    > SECTION 1. NUMBER OF DIRECTORS. The number of directors that shall constitute the entire Board shall be nine (9) until changed by the Board of Directors pursuant to the affirmative vote of a majority of the directors then in office or approval of the stockholders. Any decrease in the authorized number of directors shall not become effective until the expiration of the term of the directors then in office, unless at the time of such decrease, there are vacancies on the Board of Directors which are being eliminated by the decrease. This provision may not be amended by the Board of Directors and may only be amended by stockholders holding the voting

power of a majority of the shares present and entitled to vote at the meeting.

2. To amend Section 4 of Article II of the Company's Amended and Restated By-laws, by replacing it in its entirety with the following:

> SECTION 4. VACANCIES IN THE BOARD OF DIRECTORS. In the event a vacancy in the Board of Directors or any director's office is created by reason of death, resignation, disqualification, removal or other cause or by reason of any increase in the authorized number of directors, the directors then in office, though less than a majority of the whole authorized number of directors, by the vote of a majority of their number, or a sole remaining director may fill such vacancy for the unexpired term; provided that any vacancy in the Board of Directors that results from an increase in the number of directors approved by the stockholders or the removal of a director by the stockholders shall be filled by stockholders at a meeting or special meeting holding a plurality of the voting power of the shares present and entitled to vote at such meeting. This provision may not be amended by the Board of Directors and may only be amended by stockholders holding the voting power of a majority of the shares present and entitled to vote at the meeting.

3. To elect John Ahn, Bob D'Agostino, Jared Davis and Joseph Patrick Hannan, to the Company's Board of Directors to fill the vacancies on the Board of Directors.

4. To repeal each provision of or amendment to the Company's Amended and Restated By-laws (other than any amendments contemplated by the foregoing proposals) adopted after the version of the by-laws included as Exhibit 3(i) to the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2005, as filed with the Securities and Exchange Commission on November 9, 2005.

RIP further requests that, at such time as the Company has received requests from other stockholders who, together with the Shares, hold in excess of 20% of the Company's outstanding stock, the Company set the date and time of the special meeting as requested above. This Notice shall serve to satisfy the notice requirements of Section 2 of Article I of the By-laws as to the below described nominations and proposals. RIP demands that voting at the Special Meeting be conducted by a stock vote pursuant to Section 6 of Article I of the By-laws.

RIP reserves the right to nominate substitute persons to the Board of Directors if the Company makes or announces any changes to its By-laws, or takes or announces any other action that has, or if consummated would have, the effect of disqualifying any of the nominees to the Board of Directors. To the extent that the size of the Board of Directors is increased above five (5), then

2

Source: REGENT COMMUNICATION, SC 13D/A, July 20, 2007

RIP reserves the right to nominate additional nominees to be elected to the Company's Board of Directors at the Special Meeting. Additional nominations made pursuant to the preceding sentence are without prejudice to the position that any attempt to increase the size of the current Board of Directors constitutes an unlawful manipulation of the Company's corporate machinery.

RIP, is reserving the right, consistent with the requirements of applicable law, to submit additional proposals, fewer proposals or different proposals at the Special Meeting. If this Notice shall be deemed for any reason by a court of competent jurisdiction to be ineffective with respect to the any of the foregoing proposals at the Special Meeting, or if any individual nominee to the Board of Directors shall be unable to serve, this Notice shall continue to be effective with respect to the remaining proposals, the remaining nominees and as to any replacement nominee.

***

Sincerely,

Riley Investment Partners Master Fund, L.P.
By: Riley Investment Management LLC, its general partner

By:    /s/ JOHN AHN
_____
       Name: John Ahn
       Title: Principal

Attachment

3

_____

Created by 10KWizard    www.10KWizard.com

Source: REGENT COMMUNICATION, SC 13D/A, July 20, 2007

# EXHIBIT E

AMENDED AND RESTATED BY-LAWS
OF
REGENT COMMUNICATIONS, INC.
(effective as of July 27, 2005)
ARTICLE I

STOCKHOLDERS

SECTION 1. ANNUAL MEETING. The annual meeting of stockholders, for the purpose of electing directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting, shall be held at such place, on such date, and at such time as the Board of Directors shall each year fix, which date shall be within thirteen (13) months of the last annual meeting of stockholders or, if no such meeting has been held, the date of incorporation.

SECTION 2. SPECIAL MEETINGS. Special meetings of the stockholders, for any purpose or purposes prescribed in the notice of the meeting, may be called by the Chairman of the Board, the President, or the Board of Directors, and shall be called by the President or the Secretary upon the written request of stockholders holding of record twenty percent (20%) or more of all shares of stock outstanding and entitled to vote thereat, to be held at such place, on such date and at such time as the caller of such meeting shall fix. No business other than that specified in the notice shall be considered at any special meeting except with the unanimous consent of all stockholders entitled to receive notice of such meeting.

SECTION 3. NOTICES OF MEETINGS. Except as otherwise required by law (meaning, here and hereinafter, as required from time to time by the Delaware General Corporation Law or the Certificate of Incorporation or By-laws of the Corporation), a written notice of each annual and special meeting of stockholders stating those date, time and place thereof, and in the case of a special meeting, the purpose or purposes thereof, shall be personally delivered, or deposited, postage prepaid, in the U.S. mail for delivery, to each stockholder of record entitled to notice of such meeting, not more than sixty (60) days nor less than ten (10) days before the date on which such meeting is to be held. If mailed, such notice shall be addressed to each stockholder at his address as it appears upon the records of the Corporation. Notice of adjournment of a meeting need not be given if the time and place to which it is adjourned are fixed and announced at such meeting; provided, however, that if the date of any adjourned meeting is more than thirty (30) days after the date for which the meeting was originally noticed, or if a new record date is fixed for the adjourned meeting, written notice of the place, date, and time of the adjourned meeting shall be given in accordance with this Section.

At an adjourned meeting, any business may be transacted which could have been transacted at the original meeting.

Notice of the time, place, and purposes of any meeting of stockholders, whether or not required by law, may be waived in writing, either before or after the holding of such meeting, by any stockholder, which writing shall be filed with or entered upon the records of the meeting. The attendance of any stockholder at any such meeting without protesting, prior to or at the commencement of the meeting, the lack of proper notice shall be deemed to be a waiver by him of notice of such meeting; provided, however, that such waiver shall not be deemed to permit consideration at a special meeting of any business not specified in the notice.

SECTION 4. QUORUM; ADJOURNMENT. At any meeting of stockholders, the holders of a majority of the outstanding shares of stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum for all purposes, except when a greater proportion is required by law. Where a separate vote by a class or classes of stock is to be taken, a majority of the outstanding shares of stock of such class or classes, present in person or by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter.

At any meeting, whether a quorum is present or not, the chairman of the meeting or the holders of a majority of the shares of stock entitled to vote who are present, in person or by proxy, may adjourn the meeting to another place, date or time without notice other than by announcement at the meeting. At any such adjourned meeting at which a quorum is presented, any business may be transacted which could have been transacted at the original meeting.

SECTION 5. ORGANIZATION OF MEETINGS. Such person as the Board of Directors may have designated or, in the absence of such a person, the chief executive officer of the Corporation or, in his absence, such person as may be chosen by the holders of a majority of the shares of stock entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairman of the meeting. The Secretary of the Corporation shall act as secretary of the meeting. In the absence of the Secretary of the Corporation, the secretary of the meeting shall be such person as the chairman of the meeting appoints to act as such.

The chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as may seem to him to be in order. The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting.

SECTION 6. PROXIES AND VOTING. Every stockholder entitled to vote at a meeting of stockholders or to consent or dissent to corporate action in writing without a meeting may authorize another person to act for him as proxy pursuant to an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting. The instrument appointing a proxy must be in writing and must be either signed by the person making the appointment or, in the case of a authorization by means of telegram, cablegram or other form of electronic transmission, must set forth or be submitted with such information from

-2-

which it may be determined that such telegram, cablegram or other electronic transmission was authorized by the stockholder. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission duly constituting the appointment of a proxy may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission. A vote in accordance with the terms of a duly authorized and filed proxy shall be valid notwithstanding the previous death or incapacity of the principal or revocation of the appointment unless notice in writing of such death, incapacity or revocation shall have been given to the Corporation before such vote is taken. The presence of a stockholder at a meeting shall not operate to revoke a proxy unless and until notice of such revocation is given to the Corporation in writing or in open meeting.

Except as otherwise required by law, all voting, including on the election of directors, may be conducted by voice vote unless a stock vote is demanded by a stockholder entitled to vote or his proxy. Every stock vote shall be taken by written ballot, each of which shall state the name of the stockholder or the proxy voting and such other information as may be required under the procedure established for the meeting. The Corporation may, and to the extent required by law, shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof. The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting may, and to the extent required by law, shall, appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his duties, shall take an oath and sign faithfully to execute the duties of inspector with strict impartiality and according to the best of his ability. Every vote taken by ballots shall be conducted by an inspector or inspectors appointed by the chairman of the meeting.

In all matters other than the election of directors, the affirmative vote of the majority of shares present, in person or by proxy, at the meeting and entitled to vote on the matter shall constitute the act of the

stockholders. The election of directors shall be determined by a plurality of the votes of the shares present, in person or by proxy, at the meeting and entitled to vote in the election of directors. Where a separate vote by class or classes is required, the affirmative vote of the majority of shares of each such class present in person or represented by proxy at the meeting shall be the act of such class.

SECTION 7. STOCK LIST. A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order for each class of stock and showing the address of each such stockholder and the number of shares of stock registered in his or her name, shall be open to the examination of any such stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or if not so specified, at the place where the meeting is to be held.

-3-

The stock list shall also be kept at the place of the meeting during the whole time thereof and shall be open to the examination of any such stockholder who is present. The list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

SECTION 8. CONSENT OF STOCKHOLDERS IN LIEU OF MEETING. Any action which is required or may be taken at any annual or special meeting of the stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of the outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, to its principal place of business, or to an officer or agent of the Corporation having custody of the book in which proceedings or meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.

Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the date of the earliest dated consent delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take action are delivered to the Corporation in the manner prescribed in the first paragraph of this Section.

ARTICLE II

DIRECTORS

SECTION 1. NUMBER OF DIRECTORS. The number of directors that shall constitute the entire Board shall be such number as the Board of Directors shall from time to time designate pursuant to the affirmative vote of a majority of the directors then in office, except that in the absence of any such designation, such number of directors shall be two (2). Any decrease in the authorized number of directors shall not become effective until the expiration of the term of the directors then in office, unless, at the time of such decrease, there are vacancies on the Board of Directors which are being eliminated by the decrease.

SECTION 2. ELECTION OF DIRECTORS AND TERM OF OFFICE. At all elections of directors the candidates receiving the greatest number of votes shall be elected. Each director shall hold office until the annual meeting of stockholders next succeeding his election and until his successor is elected and qualified, or until his earlier resignation, removal from office, or death.

SECTION 3. QUALIFICATION OF DIRECTORS. Directors of the Corporation need not be stockholders of the Corporation.

-4-

SECTION 4. VACANCIES IN THE BOARD OF DIRECTORS. In the event a vacancy in the Board of Directors or any director's office is created by reason of death, resignation, disqualification, removal or other cause or by reason of an increase in the authorized number of directors, the directors then in office, though less than a majority of the whole authorized number of directors, by the vote of a majority of their number, or a sole remaining director, may fill such vacancy for the unexpired term.

SECTION 5. REGULAR MEETINGS OF DIRECTORS. An annual meeting of the Board of Directors shall be held immediately following the adjournment of each annual meeting of stockholders of the Corporation. The Board of Directors may, by resolution, provide for other regular meetings of the Board, to be held at such place or places, on such date or dates, and at such time or times as may established by the Board of Directors and published among all of the directors. Notice of the annual and any such other regular meeting of the Board of Directors shall not be required.

SECTION 6. SPECIAL MEETINGS OF DIRECTORS. Special meetings of the Board of Directors may be called by one-third (1/3) of the directors then in office (rounded up to the nearest whole number) or by the Chairman of the Board or the President and shall be held at such place, on such date, and at such time as the caller of such meeting shall fix. Notice of the place, date, and time of each such special meeting shall be given each director by whom it is not waived by mailing written notice not less than five (5) days before the meeting or by telegraphing or telexing or by facsimile transmission of the same not less than twenty-four (24) hours before the meeting. Such notice may be waived in writing, either before or after the holding of such meeting, by any director, which writing shall be filed with or entered upon the records of the meeting. The attendance of any director at any such meeting without protesting, prior to or at the commencement of the meeting, the lack of proper notice shall be deemed to be a waiver by him of notice of such meeting. Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting of directors.

SECTION 7. QUORUM. At any meeting of the Board of Directors, a majority of the whole authorized number of directors shall constitute a quorum for all purposes, except that a majority of the directors then in office shall constitute a quorum for filling a vacancy in the Board of Directors. Whenever less than a quorum is present at any time and place appointed for a meeting of the Board, a majority of those present may, by announcement at the meeting, adjourn the meeting to another place, date or time without further notice or waiver thereof.

SECTION 8. PARTICIPATION IN MEETINGS BY COMMUNICATIONS EQUIPMENT. Members of the Board of Directors, or of any committee thereof, may participate in a meeting of the Board or such committee by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at such meeting.

SECTION 9. CONDUCT OF BUSINESS AT A MEETING OF THE BOARD. At any meeting of the Board of Directors, business shall be transacted in such order and manner as the Board may from time to time determine, and all matters shall be determined by the vote of a majority of the directors present, except as otherwise required by law and except according to the

-5-

vote of a greater number as may be required pursuant to Article III, Section 1 hereof with respect to the Executive Committee. The act of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors unless the act of a greater number is required by law and except according to the vote of a greater number as may be required pursuant to Article III, Section 1 hereof with respect to the Executive Committee.

SECTION 10. CONSENT OF DIRECTORS IN LIEU OF MEETING. Action may be taken by the Board of Directors without a meeting if all members thereof consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors.

SECTION 11. POWER OF THE BOARD OF DIRECTORS. The Board of Directors may, except as otherwise required by law, exercise all such powers and do all such acts and things as may be exercised or dome by the Corporation.

SECTION 12. COMPENSATION OF DIRECTORS. Directors, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other forms of compensation for their services as directors, including, without limitation, their services as members of committees of the Board of Directors.

SECTION 13. CHAIRMAN OF THE BOARD. The Board of Directors shall elect one of its members to serve as the Chairman of the Board. The Chairman of the Board shall preside at all meetings of the stockholders and of the Board of Directors. The Chairman of the Board may be, but need not be, an officer of the Corporation. The Chairman of the Board shall perform all duties incidental to his position as may be required by law and all such other duties as may be assigned to him by the Board of Directors from time to time.

<div align="center">

ARTICLE III

COMMITTEES OF THE BOARD OF DIRECTORS

</div>

SECTION 1. EXECUTIVE COMMITTEE.

(a) There shall be established an Executive Committee of the Board of Directors composed of five non-management Directors elected by the Board of Directors. The establishment of this Executive Committee and the authority delegated to it hereunder shall be effective upon the earliest closing by the Company after the date hereof of an underwritten public offering of Common Stock of the Company (i) at a per share price of at least $6.50 (equitably adjusted for any stock splits, reverse stock splits or stock dividends accruing after the date hereof) and generating not less than $50,000,000 of gross proceeds payable to the Company, if such public offering occurs prior to June 15, 2000, and (ii) at a per share price of at least $12.00 (equitably adjusted for any stock splits, reverse stock splits or stock dividends accruing after the date hereof) and generating not less than $25,000,000 of gross proceeds payable to the Company (excluding the effect of any over-allotment option) if such public offering occurs on or

<div align="center">

-6-

</div>

after June 15, 2000. Those elected to serve are Kenneth J. Hanau, William H. Ingram, Richard H. Patterson, William P. Sutter, and John H. Wyant. Each member of the Executive Committee shall hold office until his death or resignation, or until he shall cease to be a Director.

(b) The Executive Committee shall have the power and authority of the Board of Directors, in accordance with applicable Delaware law, to review and make recommendations to the Board of Directors regarding:

(i) the purchase or lease by the Company or any subsidiary thereof of any business or assets, other than the purchase or lease of assets in the ordinary course of business (a purchase or lease of any radio broadcasting station or Federal Communications Commission license not being a purchase or lease in the ordinary course), or the execution of any agreement providing for the purchase, lease, construction or management of or in respect of radio broadcasting stations (including time brokerage agreements and local marketing agreements and the like);

(ii) the sale of any assets (other than substantially all) of the Company or any subsidiary thereof, or the execution of any agreement in respect thereof (other than the sale of advertising time and excess or obsolete furniture, fixtures or equipment in the ordinary course of business);

(iii) the issuance or sale of any equity or debt securities of the Company or any subsidiary thereof or any rights to acquire any of such equity or debt securities (including options and warrants) or the issuance or sale of stock appreciation or other "phantom" stock rights, other than Permitted Issuances (as defined below), or the execution of any agreements in respect thereof;

(iv) the incurrence or assumption of any Indebtedness (as defined below) by the Company or any subsidiary thereof, other than Permitted Indebtedness (as defined below); and

(v) any amendment or modification of Article III, Section 1, of these by-laws or any other by-law amendments to the extent they relate to the Executive Committee or its power or authority.

All matters of the nature described above shall, before any action may be taken thereon by the Board of Directors, first be delegated to the Executive Committee by the Chairman of the Board or President for review and recommendation to the Board of Directors.

For purposes of this Section, the following definitions shall apply:

"Indebtedness" means the principal of, premium, if any, and unpaid interest on: (a) indebtedness for money borrowed from others; (b) indebtedness guaranteed, directly or indirectly, in any manner by the Company, or in effect guaranteed, directly or indirectly, in any manner by the Company through an agreement, contingent or otherwise, to supply funds to, or in any other manner invest in, the debtor, or to purchase indebtedness, or to purchase and pay for

-7-

property if not delivered or pay for services if not performed, primarily for the purpose of enabling the debtor to make payment of the indebtedness or to assure the owners of the indebtedness against loss; (c) all indebtedness secured by any mortgage, lien, pledge, charge or other encumbrance upon property owned by the Company, even though the Company has not in any manner become liable for the payment of such indebtedness; (d) all indebtedness of the Company created or arising under any conditional sale, lease (intended primarily as a financing device) or title retention or security agreement with respect to property acquired by the Company even though the rights and remedies of the seller, lessor or lender under such agreement or lease in the event of default may be limited to repossession or sale of such property, and (e) renewals, extensions and refunding of any such indebtedness.

"Permitted Indebtedness" means (i) Indebtedness of the Company outstanding as of the date the establishment of the Executive Committee becomes effective; and (ii) Indebtedness to the extent permitted under the Company's senior credit facility in effect as of the date the establishment of the Executive Committee becomes effective.

"Permitted Issuances" means any of the following: (i) the issuance of shares of Common Stock on the conversion of any shares of convertible securities of the Company outstanding as of the date the establishment of the Executive Committee becomes effective; (ii) the issuance of shares of Common Stock upon the exercise of outstanding options or warrants to purchase Common Stock or Preferred Stock of the Company; and (iii) the grant and/or exercise of options under the Company's 1998 Management Stock Option Plan or other stock option plan of the Company duly authorized in accordance with these by-laws.

(c) Anything to the contrary notwithstanding, the Executive Committee shall not have the power to amend, alter or repeal any resolution of the Board of Directors relating to a matter that has been previously referred to the Executive Committee in accordance with this resolution that has been adopted by the affirmative vote of two-thirds of the total number of Directors or that shall not be within the scope of the matters specified in Section 1(b) as subject to review by the Executive Committee.

(d) In the event the Executive Committee votes to recommend any action to the Board of Directors, the Board of Directors may approve or reject such action by a vote of a majority of the voting Directors (assuming that a quorum is present). In the event the Executive Committee votes not to recommend any such action or within 10 business days after the matter has been referred to it in writing by the Chairman of the Board or the President, fails to provide any recommendation, or if the Board of Directors has determined to act on any matter described herein to be delegated to the Executive Committee without first seeking the recommendation of the Executive Committee with respect thereto, the Board of Directors may approve such action or matter by, and only by, the affirmative vote of two-thirds of the total number of Directors with respect to matters described in Section 1(b)(i)-(iv) and by the affirmative vote of three-fourths of the total number of Directors with respect to matters described in Section 1(b)(v) above.

(e) The Executive Committee shall meet from time to time as may be necessary on notice from the Chairman of the Board, the President or any member of the Executive Committee. The Executive Committee may fix its own rules of procedure, including provision

-8-

for notice of its meetings. It shall maintain custody of all data furnished to, and all rules of, the Committee, shall keep a record of its proceedings and shall report these proceedings to the Board of Directors at the meeting thereof held next after they have been taken, and all such rules of procedure shall be subject to revision or alteration by a three-fourths vote of the total number of Directors.

(f) Vacancies on the Executive Committee shall be filled by appointment by the Board of Directors.

(g) Compensation for attendance at Executive Meetings shall be as determined from time to time by the Board of Directors.

(h) The existence of the Executive Committee and the provisions regarding its rights and duties contained herein shall terminate on the earlier of the third anniversary of its establishment or on the affirmative vote of three-fourths of the total number of Directors. Further, neither the power or authority of the Executive Committee, nor the manner in which the Executive Committee shall act in respect of matters to be delegated to it, nor the provisions of this Article III in respect of the Executive Committee shall be amended or modified by the Board of Directors without the prior approval of the Executive Committee unless approved by the vote of three-fourths of the total number of Directors.

SECTION 2. OTHER COMMITTEES. The Board of Directors, by the vote of a majority of the whole Board, may from time to time designate one or more committees of the Board, with such lawfully delegable powers and duties as it thereby confers, to serve at the pleasure, direction and control of the Board. The resolution establishing each such committee shall specify a designation by which it shall be known, fix its powers and authority, and elect a director or directors to serve as its member or members, designating, if the Board desires, other directors as alternate committee members who may replace any absent or disqualified member at any meeting of the committee. An act or authorization of an act by any such committee within the authority lawfully delegated to it by the resolution establishing it shall be as effective for all purposes as the act or authorization of the Board of Directors. No such committee shall abrogate any of the powers or authority specifically given to the Executive Committee in Section 1 of this Article III.

SECTION 3. CONDUCT OF BUSINESS AT COMMITTEE MEETINGS. Each committee may determine the procedural rules for meeting and conducting its business and shall act in accordance therewith, except as otherwise provided by law. Adequate provision shall be made for notice to members of all meetings. One-third (1/3) of the members shall constitute a quorum. All matters shall be determined by a majority vote of the members present, except that a recommendation by the Executive Committee that the Board of Directors approve or reject any action shall be made by the majority vote of the total members of the Executive Committee. Action may be taken by any committee without a meeting if all members thereof consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of such committee.

-9-

## ARTICLE IV

### OFFICERS

SECTION 1. OFFICERS. The officers of the Corporation shall be a Chief Executive Officer, President, Secretary, and Treasurer, and such other officers and assistant officers as the Board of Directors may determine from time to time. If the Board of Directors elects the Chief Executive Officer or any other officer to be the Chairman of the Board, then the position of Chairman of the Board also shall be an officer of the Corporation. Any number of offices may be held by the same person.

SECTION 2. ELECTION AND TERM OF OFFICE. Each officer of the Corporation shall be elected by the Board of Directors, and shall hold office until the annual meeting of the Board of Directors following his election or until his earlier resignation, removal from office, or death. The Board of Directors may remove any officer at any time, with or without cause. The Board of Directors may fill any vacancy in any office occurring from whatever cause.

SECTION 3. DUTIES OF OFFICERS. Each officer and assistant officer shall have such duties, responsibilities, powers and authority as are prescribed below and as are assigned to him by the Board of Directors from time to time. The Board of Directors may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

(a) CHIEF EXECUTIVE OFFICER. The Chief Executive Officer of the Corporation shall be responsible for the general management and control of the business and affairs of the Corporation and shall perform all duties and have all powers which are commonly incident to the office of chief executive officer and those which are delegated to him by the Board of Directors. The Chief Executive Officer shall have the power to take all actions as these By-Laws may provide to the President of the Corporation including, without limitation, the powers granted to the President in Article I, Section 2, Article II, Section 6, Article IV, Section 4, and Article VI, Section 1. He shall have the power to sign all stock certificates, contracts and other instruments of the Corporation which are authorized.

(b) PRESIDENT. The President shall be the chief operating officer of the Corporation. Subject to the provisions of these By-laws and to the direction of the Board of Directors, he shall have the responsibility for the general operations of the Corporation and shall perform all duties and have all powers which are commonly incident to the office of chief operating officer and those delegated to him by the Board of Directors. He shall have the power to sign all stock certificates, contracts and other instruments of the Corporation which are authorized.

(c) VICE PRESIDENT. The Vice President, if one be elected, shall perform such duties as may from time to time be assigned to him by the Board of Directors. At the

-10-

request of the Chairman of the Board or the President, or in the absence or disability of the President, the Vice President designated by the Chairman of the Board or the President (or in the absence of such designation, the Vice President designated by the Board of Directors), shall perform all the duties of the President, and when so acting, shall have all the powers of the President. The authority of the Vice President to sign in the name of the corporation all certificates for shares and authorized deeds, mortgages, bonds, contracts, notes and other instruments shall be coordinated with like authority of the President.

(d) SECRETARY. The Secretary shall issue all authorized notices for, and shall keep the minutes of, all proceedings of the Board of Directors and of the stockholders and make a proper record of the same, which shall be attested by him. He shall keep such books as may be required by the Board of Directors, shall, in the absence of a duly appointed transfer agent, take charge of the stock book of the Corporation, and shall issue and attest all certificates of stock. He shall have the authority to sign all deeds, mortgages, bonds, contracts, notes and other instruments requiring his signature at the express direction of the Board of Directors or with the countersignature of the Chairman of the Board, the President, or of any other officer expressly authorized to do so. He shall further have such other powers as are commonly incident to the office of Secretary and all the powers and duties which the Board of Directors may, from time to time, assign to him.

(e) TREASURER. The Treasurer shall have the responsibility for maintaining the financial records of the Corporation. He shall make such disbursements of the funds of the Corporation as are authorized and shall render from time to time an account of all such transactions and of the financial condition of the Corporation. He shall perform such other duties as are commonly incident to the office of Treasurer and as may from time to time be assigned by the Board of Directors to him.

(f) ASSISTANT AND SUBORDINATE OFFICERS. The Board of Directors may appoint such assistant and subordinate officers as it may deem desirable. Each such officer shall hold office during the pleasure of the Board of Directors and perform such duties as the Board of Directors may prescribe.

SECTION 4. ACTION WITH RESPECT TO SECURITIES OF OTHER ENTITIES. Unless otherwise directed by the Board of Directors, the Chairman of the Board, the President or any other officer of the Corporation authorized by the Chairman of the Board or the President shall have the power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of, or with respect to any action taken by, the stockholders, partners, members or other equity owners of any corporation, partnership, limited liability company or other entity in which the Corporation may hold securities, and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other entity.

-11-

ARTICLE V

STOCK

SECTION 1. CERTIFICATES OF STOCK. The interest of each stockholder of the Corporation shall be evidenced by a certificate or certificates for shares in such form as the Board of Directors may from time to time prescribe, signed by, or in the name of the Corporation, by the Chairman of the Board or the President or a Vice President, and by the Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer, certifying the number of shares owned. Any and all of the signatures on the certificate may be by facsimile.

SECTION 2. TRANSFERS OF STOCK. The shares of stock of the Corporation shall be transferable only on the stock transfer books of the Corporation kept at an office of the Corporation or by transfer agents designated to transfer shares of the stock of the Corporation. Except where a certificate is issued in accordance with Section 4 of ARTICLE V of these By-laws, an outstanding certificate shall be surrendered for cancellation before a new certificate representing the same shares is issued.

Shares of stock of the Corporation are transferable upon surrender for cancellation of a certificate or certificates representing the shares to be transferred, with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, and with such proof of the authenticity of the signature as the Corporation or its transfer agent may reasonably require.

SECTION 3. LOST, STOLEN OR DESTROYED CERTIFICATES. In the event of the loss, theft or destruction of any certificate of stock, another may be issued in its place pursuant to such regulations as the Board of Directors may establish concerning such proof of loss, theft or destruction and concerning the giving of a satisfactory bond or bonds of indemnity.

SECTION 4. OTHER REGULATIONS. The issue, transfer, conversion and registration of certificates of stock shall be governed by such other regulations as the Board of Directors may establish.

ARTICLE VI

RECORD DATE

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders of the Corporation, or to receive payment of any dividend or other distribution or allotment of any rights, or to exercise any rights in respect if such change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date on which the resolution fixing the record date is adopted and which record date shall be not more than sixty

-12-

(60) days nor less than ten (10) days prior to the date of any meeting of stockholders, nor more than sixty (60) days prior to the time of any dividend or distribution payment date or any date for the allotment of rights, or other matter provided by law. If no record date has been so fixed for the purpose of determining stockholders entitled to notice of or to vote at a meeting of stockholders, then such record date shall be the close of business on the day next preceding the day on which notice of the meeting is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. If no record date has been so fixed for the purpose of determining stockholders entitled to receive payment of any dividend or other distribution or allotment of rights or to exercise any rights of change, conversion or exchange of stock or for any other purpose, the record date shall be at the close of business on the day on which the Board of Directors adopts a resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

The Board of Directors may close the books of the Corporation against transfer of shares during the whole or any part of the period commencing with the record date and continuing until completion of the meeting (including all adjournments thereof) or the transaction to which the record date pertains.

In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall be not more than ten (10) days after the date upon which the resolution fixing the record date is adopted. If no record date has been fixed by the Board of Directors and no prior action by the Board of Directors is required by the Delaware General Corporation Law, the record date shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in the manner prescribed by ARTICLE I, Section 8 hereof. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by the Delaware General Corporation Law with respect to the proposed action by written consent of the stockholders, the record date for determining stockholders entitled to consent to corporation action in writing shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

### ARTICLE VII

### INDEMNIFICATION OF DIRECTORS AND OTHER PERSONS

SECTION 1. INDEMNIFICATION. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person who was or is made or is threatened to be made a party, or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or

-13-

---

investigative (a "proceeding"), by reason of the fact that he, or a person for whom he is the legal representative, is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person. The Corporation shall be required to indemnify a person in connection with a proceeding initiated by such person only if the proceeding was authorized by the Board of Directors of the Corporation.

SECTION 2. PREPAYMENT OF EXPENSES. The Corporation shall pay the expenses of directors and executive officers of the Corporation, and may pay the expenses of all other officers, employees or agents of the Corporation, incurred in defending any proceeding, in advance of its final disposition, PROVIDED, however, that the payment of expenses incurred by a director, officer, employee or agent in advance of the

final disposition of the proceeding shall be made only upon receipt of an undertaking by the director, officer, employee or agent to repay all amounts advanced if it should be ultimately determined that the director, officer, employee or agent is not entitled to be indemnified under this Article VII or otherwise.

SECTION 3. CLAIMS. If a claim for indemnification or payment of expenses under this Article VII is not paid in full within sixty days after a written claim therefor has been received by the Corporation, the claimant may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

SECTION 4. NON-EXCLUSIVITY OF RIGHTS. The rights conferred on any person by this Article VII shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the certificate of incorporation, bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

SECTION 5. OTHER INDEMNIFICATION. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust, enterprise or nonprofit entity, shall be reduced by any amount such person may collect as indemnification from such other Corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

SECTION 6. INSURANCE. The Corporation may purchase and maintain insurance, at its expense, to protect itself and any person who is or was a director, officer, trustee, employee, or agent of the Corporation, or is or was serving at the request of the Corporation as a director, trustee, officer, employee, or agent of another corporation, domestic or foreign, nonprofit or for profit, partnership, joint venture, trust or other enterprise (including, without limitation, an employee benefit plan), against any expense, liability, or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

-14-

SECTION 7. AMENDMENT OR REPEAL. Any repeal or modification of the foregoing provisions of this Article VII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

ARTICLE VIII

AMENDMENT

These By-laws may be amended or repealed by the Board of Directors at any meeting or by the stockholders at any meeting or written consent in lieu thereof in accordance with these By-laws.

ARTICLE IX

MISCELLANEOUS

SECTION 1. NOTICES. Except as otherwise provided herein or as required by law, any notices required to be delivered pursuant to these By-laws shall be in writing and shall be effectively given by hand delivery to the recipient thereof, by depositing such notice in the U.S. mails, postage pre-paid, or by sending such notice by pre-paid telegram or mailgram addressed to the recipient at his last known address on the books of the Corporation. The time when such notice is received, if hand delivered, or the time when such notice is dispatched, if delivered through the mails or by telegram or mailgram, shall be the time of the giving of the notice.

A written waiver of any notice, signed by the person entitled to such notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person. With respect to the waiver of notice of any meeting, neither the business nor the purpose of the meeting need be specified the waiver.

SECTION 2. CORPORATE SEAL. The Board of Directors may provide a suitable seal, containing the name of the Corporation, which seal shall be in the charge of the Secretary. If and when so directed by the

Board of Directors or a committee thereof, duplicates of such seal may be kept and used by the Treasurer or by an Assistant Secretary or Assistant Treasurer.

SECTION 3. RELIANCE UPON BOOKS, REPORTS AND RECORDS. Each director, member of any committee designated by the Board of Directors, and each officer of the Corporation shall, in the performance of his duties, be fully protected in relying in good faith on the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees or the committees of the Board of Directors, or by any other person as to matters which such director or

-15-

committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

SECTION 4. FISCAL YEAR. The fiscal year of the Corporation shall be as fixed by the Board of Directors.

SECTION 5. TIME PERIODS. In applying any provision of these By-laws which requires that an act be done or not be done a specified number of days prior to an event or during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included."

-16-

# EXHIBIT F



# FORM SC 13D/A

## REGENT COMMUNICATIONS INC - RGCI

**Filed: August 09, 2007 (period: )**

An amendment to a SC 13D filing

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### SCHEDULE 13D
### (Rule 13d-2-101)

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT TO RULE 13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO RULE 13d-2(a)**

(Amendment No. 3)[1]

**Regent Communications, Inc.**
(Name of Issuer)

**Common Stock**
(Title of Class of Securities)

**758865109**
(CUSIP Number)

**Riley Investment Management LLC**
**Attn: Bryant R. Riley**
**11100 Santa Monica Blvd.**
**Suite 810**
**Los Angeles, CA 90025**
**(310) 966-1445**
(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

**August 9, 2007**
(Date of Event which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(b)(3) or (4), check the following box: ☐

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7(b) for other parties to whom copies are to be sent.

(Continued on following pages)

---

[1]   The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Source: REGENT COMMUNICATION, SC 13D/A, August 09, 2007

CUSIP No. 758865109 | 13D | Page 2

| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Partners Master Fund, L.P. | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [ ]<br>(b) [X] |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS*<br>WC | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>[ ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Cayman Islands | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | 7 | SOLE VOTING POWER<br>2,588,913 | |
| | 8 | SHARED VOTING POWER<br>-0- | |
| | 9 | SOLE DISPOSITIVE POWER<br>2,588,913 | |
| | 10 | SHARED DISPOSITIVE POWER<br>-0- | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>2,588,913 | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*<br>[ ] | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.7%[1] | | |
| 14 | TYPE OF REPORTING PERSON*<br><br>PN | | |

---

1    Based on 38,783,278 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at August 1, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 filed with the Securities and Exchange Commission on August 8, 2007.

CUSIP No. 758865109 | **13D** | Page 3

| | |
|---|---|
| 1 | NAME OF REPORTING PERSON<br>S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON<br><br>Riley Investment Management LLC |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a) [ ]<br>(b) [X] |
| 3 | SEC USE ONLY |
| 4 | SOURCE OF FUNDS*<br>AF |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e)<br>[ ] |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br>Delaware |

| NUMBER OF | 7 | SOLE VOTING POWER<br>2,588,913[1] |
|---|---|---|
| SHARES | | |
| BENEFICIALLY | 8 | SHARED VOTING POWER<br>822,504[2] |
| OWNED BY | | |
| EACH | 9 | SOLE DISPOSITIVE POWER<br>2,588,913[1] |
| REPORTING | | |
| PERSON | 10 | SHARED DISPOSITIVE POWER<br>822,504[2] |
| WITH | | |

| | |
|---|---|
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br>2,853,242[2] |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES*<br>[X] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br>7.4%[3] |
| 14 | TYPE OF REPORTING PERSON*<br>IA |

1    Because Riley Investment Management LLC has sole investment and voting power over 2,588,913 shares of Common Stock held by Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC may be deemed to have beneficial ownership of these shares.

2    Riley Investment Management LLC has shared voting and dispositive power over 822,504 shares of Common Stock held by its investment advisory clients, 264,329 of which are held by an investment advisory client indirectly affiliated with Mr. Riley. However, Riley Investment Management LLC disclaims beneficial ownership of the non-affiliated shares.

3    Based on 38,783,278 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at August 1, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 filed with the Securities and Exchange Commission on August 8, 2007.

Source: REGENT COMMUNICATION, SC 13D/A, August 09, 2007

**13D**

| 1 | NAME OF REPORTING PERSON S.S. OR IRS. IDENTIFICATION NO. OF ABOVE PERSON Bryant R. Riley | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) [  ] (b) [X] |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS* AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) OR 2(e) [  ] | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION United States | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER 2,588,913[1] | |
| | 8 | SHARED VOTING POWER 822,504[2] | |
| | 9 | SOLE DISPOSITIVE POWER 2,588,913[1] | |
| | 10 | SHARED DISPOSITIVE POWER 822,504[2] | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON 2,853,242[2] | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES SHARES* | | [X] |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) 7.4%[3] | | |
| 14 | TYPE OF REPORTING PERSON* IN | | |

1    Because Riley Investment Management LLC has sole voting and investment power over Riley Investment Partners Master Fund, L.P.'s security holdings, and Mr. Riley, in his role as the sole manager of Riley Investment Management LLC, controls its voting and investment decisions, each of Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC, and Mr. Riley may be deemed to have beneficial ownership of the 2,588,913 shares of Common Stock held by Riley Investment Partners Master Fund, L.P.

2    Riley Investment Management LLC has shared voting and dispositive power over 822,504 shares of Common Stock owned by its investment advisory clients, 264,329 of which are held by an account indirectly affiliated with Mr. Riley. Although Mr. Riley controls Riley Investment Management LLC's voting and investment decisions for its investment advisory clients, Mr. Riley disclaims beneficial ownership of the non-affiliated shares.

3    Based on 38,783,278 shares of common stock of Regent Communications, Inc. (the "Issuer") outstanding at August 1, 2007, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 filed with the Securities and Exchange Commission on August 8, 2007.

Source: REGENT COMMUNICATION, SC 13D/A, August 09, 2007

CUSIP No. 758865109                                  **13D**                                        Page 5

**Item 4.**      **Interest in Securities of the Issuer**

Item 4 as previously filed is amended to add the following information:

On August 9, 2007, RIM sent a letter to the Issuer stating that because the Issuer has ignored its obligations under its by-laws and Delaware law, that RIM would be forced to file suit against the Issuer in the Delaware Court of Chancery for (1) refusing to call a special meeting of shareholders after a request had been made by more than 20% of the record shareholders of the Company and (2) refusing to provide all of the stocklist materials to which RIP is entitled to receive under Delaware law. In the letter, RIM described some of the Issuer's attempts to obstruct the exercise of its shareholder rights. RIM demanded that the Issuer comply with its obligations under Delaware law and satisfy the stockholders' requests immediately. The foregoing description of the letter is qualified in its entirety by reference to the letter attached as Exhibit A.

Unless its demands are met, RIM anticipates that a suit will be filed on August 9, 2007 or August 10, 2007.

**Item 5.**      **Interest in Securities of the Issuer**

See Item 4.

Item 5(c) as previously filed is amended to add the following information:

(c)      The following are transactions effected by the other Reporting Persons in Common Stock that have taken place since the last 13D filing.

| Investment Advisory Clients | Trade Date | Trans Code | Quantity | Price |
|---|---|---|---|---|
| | 7/20/2007 | BY | 349 | 3.35 |
| | 7/23/2007 | BY | 850 | 3.35 |
| | 7/24/2007 | BY | 12,478 | 3.4 |
| | 7/25/2007 | BY | 81,159 | 3.3999 |
| | 7/26/2007 | BY | 34,223 | 3.3922 |
| | 7/27/2007 | BY | 12,903 | 3.3987 |
| | 7/30/2007 | BY | 3,051 | 3.4 |
| | 7/31/2007 | BY | 9,004 | 3.4024 |

**Item 7.**      **Material to be filed as Exhibits**

     **Exhibit A**      Letter, dated August 9, 2007, to the Issuer.

---

**13D**

## SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: August 9, 2007

Riley Investment Partners Master Fund, L.P.
    By: Riley Investment Management LLC, its General
    Partner

By:   /s/ Bryant R. Riley
      Bryant R. Riley, Managing Member


Riley Investment Management LLC

By:   /s/ Bryant R. Riley
      Bryant R. Riley, Managing Member

By:   /s/ Bryant R. Riley
      Bryant R. Riley

EXHIBIT A

# Riley Investment Management LLC

11100 Santa Monica Boulevard, Suite 810 Los Angeles, CA 90025
Phone (310) 966-1445 Fax (310) 966-1096

August 9, 2007

VIA OVERNIGHT DELIVERY, REGISTERED MAIL AND FACSIMILE

President, Secretary and Board of Directors
Regent Communications, Inc.
2000 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202

Dear Sirs:

Because you have ignored your obligations under Regent Communications' by-laws and Delaware law, we are forced to file suit against you in the Delaware Court of Chancery for (1) refusing to call a special meeting of shareholders after a request had been made by more than 20% of the record shareholders of the Company and (2) refusing to provide us with all of the stocklist materials that we are entitled to receive under Delaware law. We believe that it is clear that you have delayed calling a special meeting and providing us complete stocklist materials because you want to impede improperly our right to contact other shareholders to solicit their proxies to elect new directors to the board.

On multiple occasions, we have provided documentation to the Company demonstrating that record shareholders holding more than 20% of the shares have validly demanded a special meeting. Yet the Company's management and Board of Directors continue to obstruct the exercise of our shareholder rights, citing irrelevant technicalities to try to stall the process. On July 19, 2007, we sent a letter to Regent Communications requesting that the Company call a special meeting of shareholders to be held on September 3, 2007 in Cincinnati, Ohio. While more than 20% of the Company's shareholders delivered to the Company requests for the special meeting, we were initially told that the 20% requirement had not been met. After sending the Company for a second time documentation that 20% of the shareholders had made the same request for a special meeting, we were told that our request was invalid because the Company did not receive "original" copies of the request from each and every stockholder making the request. There is no such requirement in the Company's bylaws or Delaware law.

We also made a separate request under Delaware law for the Company to provide a list of stockholders and related stockholder information. However, the Company initially denied this request saying our request was insufficient for the same reasons above in addition to a legal technicality. The Company's denial was disingenuous at best, and, given that the Company has the benefit of outside counsel, could be construed as purposefully misleading. The Company's bylaws do not indicate any minimum level of voting power required to entitle a shareholder to a shareholders list. More importantly, as we informed you, Delaware courts have broadly enforced

Source: REGENT COMMUNICATION, SC 13D/A, August 09, 2007

a stockholder's right to inspect and copy the stockholders list and related materials. It took our threat of litigation for you to provide just a list of the registered holders. You continue to refuse to provide any of the other stockholder related information we reasonably requested and are entitled to under Delaware law, such as a current DTC breakdown.

Most importantly, raising specious arguments and hiding behind legal technicalities indicates to your shareholders that the Company's management and Board choose to ignore its owners rather than listening to them. Riley Investment Partners Master Fund, L.P. and our other clients are one of the Company's largest shareholders with over 8% of the outstanding shares, and we have demonstrated support of a large percentage of your other "owners". In conversations with us, your Chairman, Bill Sutter, has pointed out that we have only been shareholders since the early part of 2007. While this point is completely irrelevant, we also know that there are several long-time, underline large shareholders who have owned shares since 2002 and earlier who have also demanded a special meeting. Furthermore, given that with a handful of telephone calls, we were able to garner more than 20% of the shareholders to call a special meeting, the Board should realize that its chances of winning a proxy contest are virtually non-existent. Perhaps this is the reason that you prefer to ignore our requests? Continuing to stall or ignore us will only result in further wasting the Company's money, enriching company counsel, and end with the same result -- losing a shareholder vote. Accordingly, we demand that you to comply with your obligations under Delaware law and satisfy our requests immediately.

Sincerely,


John Ahn
Principal
Riley Investment Management LLC


Page 8

Created by 10KWizard    www.10KWizard.com

# EXHIBIT G

EFiled:  Aug 20 2007 11:59AM EDT
Transaction ID 16006565
Case No. 3154-CC

**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

WILLIAM B. CHANDLER III
CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

August 20, 2007

David J. Teklits
Morris, Nichols, Arsht & Tunnell LLP
P.O. Box 1347
Wilmington, DE  19899

Raymond J. DiCamillo
Richards, Layton & Finger
920 North King Street
Wilmington, DE  19801

Re: *Riley Investment Partners Master Fund, L.P. v. Regent Comm'cns, Inc.*
    Civil Action No. 3154-CC

Dear Counsel:

I have considered your letters of August 16 and August 17.  I remain of the opinion that this action to schedule a stockholder meeting and to inspect a stocklist should proceed promptly to a final hearing or argument in this Court, as we discussed during our teleconference.  Please confer and agree upon a scheduling order for my signature.

Very truly yours,

*William B. Chandler III*

William B. Chandler III

WBCIII:meg